**UNITED STATES of America, Appellee,**

v.

**Thomas A. DYER, Defendant, Appellant.**

**No. 85–1881.**

United States Court of Appeals, First Circuit.

Argued Oct. 7, 1986.

Decided June 19, 1987.

Thomas J. Connolly, Portland, Me., by Appointment of the Court, for appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BROWN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge.

Thomas A. Dyer appeals his conviction for conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1)[1] and 846[2] on two grounds.

---

* Of the Fifth Circuit, sitting by designation.

1. Section 841 provides:
(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

2. Section 846 provides:

Dyer contends first that his sixth amendment rights were violated by the improper seizure and use by the Government of a personal notebook he kept. Second, he argues that the District Court's jury charge regarding the defense of withdrawal was sufficiently erroneous to constitute reversible error. From a review of the record as a whole, we find no prejudicial error and accordingly, affirm.

### The Formula Fails

This is a conspiracy-to-manufacture-methamphetamine case. The other co-conspirator, Matthew Solotaire, pleaded guilty to the indictment, and only Dyer remains.

Dyer and Solotaire had been friends for ten years. Dyer had studied chemistry at the University of Maine. In May of 1984, Dyer suggested that the two of them could make methamphetamine and, in the process, a "lot of money." Solotaire agreed to the plan. Later that month, they moved to the rented house in Freeport, Maine that would serve as their laboratory. Over the course of several months, the pair procured, by mail order and in person, the necessary scientific paraphernalia for their venture. When one chemical company refused to sell certain chemicals to them as individuals, Solotaire "incorporated" the team by opening a checking account in the name of "Allen Products Co." Dyer provided the money for this account.

Alas, pharmaceutical prowess eluded the two. For a month, they attempted to concoct the illegal drugs. They were never successful. By June 21, they agreed to give up the scheme. Solotaire pleaded "moral scruples," while Dyer simply was afraid of handling the highly volatile yellow phosphorous. Dyer suggested they make ephedrine, a safer drug to make, and also apparently a legal one to distribute. Since the yellow phosphorous was not an ingredient of ephedrine, the pair moved it away from the house to the garage.

In the meantime, one of the chemical companies supplying "Allen Products Co." had become suspicious of its orders. The company tipped off the Drug Enforcement Administration (DEA). The DEA sent special agents to the house, and they kept it under surveillance all day June 20th. In making their observations, the agents reported that they detected a "chemical-like" odor emanating from the house. On the basis of this and other observations, the officers concluded they should pursue the case.

On June 21st, Solotaire and Dyer were arrested. The house was searched pursuant to a warrant. The agents confiscated a number of items, including chemicals, laboratory equipment, chemical company invoices, chemistry text books and notebooks, and pills. The pills were later analyzed and found to contain the precursors of methamphetamine.

### Booked With the Book

As though chemical problems, chemical failures, and federal involvement were not enough, on November 28, 1984, Dyer was arrested on an unrelated state law charge. As part of that arrest and accompanying search (pursuant to a proper warrant), a notebook that Dyer had kept was confiscated and held at the Brunswick Police Department evidence room.

Coincidentally, one of the agents involved in the federal offense, Special Agent Young, happened to be present at the scene of Dyer's arrest on the state law charges. On the night of the arrest, Young reviewed the notebook for no more than ten minutes. Young testified that all he saw in it were (to him) indecipherable chemical equations.

Dyer testified that he began keeping this notebook after his arrest on the federal charges. He stated that he used the notebook to record notes taken at conferences at his attorney's office, and to preserve his ideas about potential witnesses, potential defenses, points of dispute with police testi-

---

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

mony, and observations about the chemicals, procedures, and equipment involved. Included in his notes were names of suspected informants, other people who came in contact with the chemicals but were not arrested, and the names of chemicals that were present but not seized.

Dyer made several unsuccessful attempts to retrieve the book from the police department. By March 1985, however, the police had told Dyer three times that he could retrieve his notebook, if only he would stop by to pick it up. Instead, Dyer demanded that the evidence room custodian, a Lt. Pomerleau, meet him at a specified hour of night in front of a local department store to complete the return of the book.[3]

Dyer's trial began on July 8, 1985. At the close of trial, the judge gave a jury instruction regarding the defense of withdrawal, to which Dyer objected. The objection there, and here on appeal, centers around whether the judge erroneously described withdrawal as an affirmative defense available only to prevent the formulation of conspiracy, not to defeat it once formed. The trial judge, after conferring with counsel, added language to the charge that emphasized the prosecution's ultimate burden of proof as to all elements of the case. Dyer made no further objection. The jury found Dyer guilty as charged on July 12, 1985.

On October 17, 1985, a hearing was held on Dyer's motion to dismiss the indictment because of the improper seizure and use of the notebook. After a full development of the issue, the District Court denied the motion.

This appeal follows.

### Balancing the Chemical Equation

On appeal, Dyer argues first that his sixth amendment right to effective assistance of counsel was violated by the seizure of his notebook. Dyer has steadfastly maintained that the notebook contained defense strategies that were, or at least were represented to be, privileged attorney-client communications and recollections that Dyer was unable to obtain from other sources.

In October 1985, the District Court held a post-trial hearing on the issue of whether any confidential attorney-client information in Dyer's notebook was obtained by or disclosed to the United States Attorney's Office and, if so, what effect this disclosure had on the Government's conduct of its case. After reviewing testimony, memoranda, and the notebook itself, the District Court found that (i) the notebook was lawfully seized; (ii) Officer Young briefly opened the notebook at the time of the seizure but noted only the presence of chemical equations; (iii) the notebook was not directly or indirectly a source of any evidence; and (iv) all of the Government's evidence was obtained before seizure of the notebook and the contents of the notebook did not, in any way, affect the Government's case on conduct at trial or prejudice Dyer's case. In sum, what limited contact the Government may have had with the notebook did not constitute harmful error. On appeal, the District Court's findings of fact are binding unless clearly erroneous. *United States v. Regan*, 687 F.2d 531, 535 (1st Cir.1982).

Starting with the proposition that the Constitution requires effective assistance of counsel, "the essence of the sixth amendment right is, indeed, privacy of communication with counsel." *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973), *cert. denied*, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). This echoes the Supreme Court's emphasis on the importance of privacy: "[C]onfidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged.... The purpose of the privilege is to encourage clients to make full disclosure to their attorneys.... As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure,

---

**3.** Although the record is less than clear as to *how* the return was effected, it is undisputed that Dyer did get the notebook back before trial.

the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39, 51 (1976).

This case, however, does not present facts that demonstrate any harmful violation of that protection. In *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the Supreme Court set out the test to determine whether a violation of the sixth amendment's right to privileged communication has occurred. In *Weatherford*, the Court looked for (i) tainted evidence; (ii) communication of defense strategy to the prosecution; and (iii) purposeful intrusion by the government. Applying that standard to the facts before us, we agree with the District Court that no constitutional violation occurred.

On appeal, Dyer attempts an end-run around the District Court's findings by advocating a bright line rule that would make contact with privileged defense communications harmful error as a matter of law. This position did not carry the day in *Weatherford*, nor does it here. The Court rejected expressly this approach as being unduly burdensome on law enforcement personnel. *Weatherford*, 429 U.S. at 557, 97 S.Ct. at 844, 51 L.Ed.2d at 41.

█ "A sixth amendment violation cannot be established without a showing that there is a 'realistic possibility of injury' to defendants or 'benefit to the state' as a result of the government's intrusion into the attorney-client relationship." *United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir.1984); *citing Weatherford*, 429 U.S. at 558, 97 S.Ct. at 845, 51 L.Ed.2d at 41. In the instant case, as in *Weatherford*

and *Mastroianni*, no confidential attorney-client information was relayed to, or obtained by, the prosecution. The defense suffered no prejudice.

### A Conspiracy or a Withdrawal?

Dyer argues secondly that the jury was erroneously instructed on the defense of withdrawal from a conspiracy.[4] In essence, Dyer contends that the judge's instruction impermissibly described the defense of withdrawal as unavailable once a conspiracy has been formed. We reject this argument on two levels.

█ At the threshold, we point out that the concept of "withdrawal" is immaterial to Dyer's defense. From the beginning, Dyer has maintained *not* that he withdrew from the conspiracy, but instead, that he never participated in it *at all*. In the face of co-conspirator Solotaire's testimony as a witness for the prosecution, Dyer chose to deny the existence of the conspiracy rather than assert the affirmative defense of withdrawal. Thus, even if there were some infirmity with the instruction, Dyer has not shown how he could have been prejudiced by it.

Even though Dyer's defense strategy plainly did not involve withdrawal, Dyer is of course entitled to correct, thorough explanations and instructions to the jury regarding the charges against, and defenses available to him. Dyer's complaint about the propriety of this withdrawal instruction, however, is of a type we have met, and rejected, many times before.

Dyer homes in on the single phrase that "a subsequent withdrawal or abandonment from that conspiracy is not a defense."[5]

---

4. The judge's instruction was as follows:

Now if a conspiracy is as you consider this verdict in the course of your deliberations found by you to have been proven, to exist beyond a reasonable doubt, that is, if you are satisfied from the evidence that the two elements I have mentioned have been demonstrated beyond a reasonable doubt to be true, that a conspiracy for a common unlawful purpose existed and that this defendant willfully became a participant in it, *a subsequent withdrawal or abandonment from that conspiracy is not a defense*. If, on the other hand,

you find that the defendant ceased his activity, withdrew from it or abandoned it before a conspiracy was formed or before he became a willful participant in it, then you will find the defendant not guilty. The reason for that is that in such an event you would have found that no conspiracy involving this defendant had come into existence or been formed.

5. The judge instructed the jury nearly verbatim from Dyer's proposed withdrawal instruction. This contested sentence, however, was from the slightly expanded version that the judge delivered to the jury.

Considered in isolation, that is not an accurate statement of the law. *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

Dyer's challenge to the court's expansion on his proposed instruction is simply the capturing out of context of an isolated phrase which, when read within the context of the entire instruction, properly explained the applicable law. *See Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973). "The refusal to give a particular instruction is unobjectionable if the charge given adequately covers [the] theory of the defense.... The court need not give instructions in the form or language requested by the defendant." *United States v. Morris*, 700 F.2d 427, 433 (1st Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983).

Nevertheless, Judge Carter did recharge the jury following Dyer's objection to the original. The judge's restatement effectively eliminated any confusion over the instruction. He emphasized that a defendant *could* assert withdrawal following formation of the conspiracy. Further, the judge also re-explained how the division of burdens of proof worked—that the defendant had the burden for proving withdrawal, but that the government must bear "always and at all times a burden to prove every essential element...." [6] This recharge, in the context of a very thorough instruction to the jury, sufficiently addressed any uncertainty that the original instruction might have presented. Viewed as a whole, the instruction was proper.

AFFIRMED.

---

6. After the defense's objection, the judge stated to the jury:

I indicated to you that at a certain point the burden falls upon the defendant to establish that he has withdrawn from the conspiracy if that is his defense. I want to make sure that you understand that ultimately the burden of proof beyond a reasonable doubt always rests upon the government throughout a criminal trial such as this so that once the government has demonstrated the existence of a conspiracy and a defendant's participation in it, if the defendant contends he withdrew or was abandoned from the conspiracy, the burden shifts to the defendant to demonstrate that, but ultimately when you come to consider the case, you must consider in terms of the government bearing always and at all times the burden to prove every essential element of the government's case beyond a reasonable doubt.