UNITED STATES of America, Appellee,

v.

Felix RODRIGUEZ,
Defendant, Appellant.

No. 87–1917.

United States Court of Appeals,
First Circuit.

Heard July 29, 1988.

Decided Oct. 7, 1988.

John J. Barter, Boston, Mass., by Appointment of the Court, for defendant, appellant.

Mitchell D. Dembin, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

On January 20, 1987, a federal grand jury indicted defendant-appellant Felix Rodriguez on drug-related charges.[1] He was later found guilty on both counts. Following imposition of sentence, Rodriguez appealed. His principal assignment of error questions the district court's refusal to charge the jury on entrapment. He also claims that there was an impermissible imbrication—which he calls "duplicitousness"[2]—involving the two counts, thereby transgressing the Fifth Amendment's double jeopardy clause.

## I. BACKGROUND

In early 1987, appellant was employed in the meat department of the Hilo Food Market. On January 15, his co-worker, Luis Zayas, introduced him to Andres Cepero. Unbeknownst to appellant, Cepero was a government informant who had agreed to cooperate with the federal Drug Enforcement Administration (DEA) following his own arrest on drug charges. The initial conversation between Rodriguez and Cepero took place out of the earshot of others. It was not recorded. At trial, the two participants gave conflicting accounts of what was said. Cepero's version was along the following lines:

> Felix Rodriguez told me ... that he didn't have at that moment ... a kilo of cocaine but that he was going to try and get one. He gave me [his] phone number and ... told me [to call him] at home after four.

\*     \*     \*     \*     \*     \*

1. The indictment contained two counts. The first charged appellant with conspiring to distribute more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846; the second charged him with possession of a like quantity of drugs with intent to distribute the same, and with aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

2. Appellant's choice of phraseology is infelicitous. Because he asserts that the two counts charge one and the same offense, he is in reality complaining that they are multiplicitous. See *United States v. Serino*, 835 F.2d 924, 930 (1st Cir.1987); *United States v. Wood*, 780 F.2d 955, 962 (11th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 549 (1986).

Felix Rodriguez told me that while we were talking on the phone not to call the cocaine "cocaine," that we were to refer to a small cassette for $14.50 which is half a kilo, and one kilo was going to be a big cassette for $28.00.

\*   \*   \*   \*   \*   \*

[Rodriguez also said that] I was to call him but that I shouldn't give [his] telephone number to anybody.

1 Trial Transcript (T.) at 15–17.

Rodriguez's report of the same conversation was markedly different. He claimed to have been considerably less sequacious. Cepero, he testified:

asked me if I could get ... him a pound of sirloin. . . . I asked him what sort of meat [he wanted]. And then when I was showing him the meat, he said, no, that's not the type of meat I'm looking for. . . . So he told me what he was looking for was drugs ... and I said I didn't have drugs. I didn't know anybody who dealt in drugs.

\*   \*   \*   \*   \*   \*

I told him, no, I don't sell drugs, and I don't know where you can get drugs.

\*   \*   \*   \*   \*   \*

He told me that if I could get it for him, I wouldn't have any problems because he would tell me how to make the arrangements so that I wouldn't have any problem.

\*   \*   \*   \*   \*   \*

I told him that, no, I didn't deal in these things and that I didn't know who sold the stuff.

\*   \*   \*   \*   \*   \*

He went on insisting and he said if I helped him get half a kilo of cocaine or one kilo of cocaine that I would earn the type of money I couldn't earn at work.

\*   \*   \*   \*   \*   \*

I told him I didn't know, and so he went on insisting and he said, look, with this you could earn more or less up to $1000, and you would never make this money

working here. Well, I told him, I know a guy who is a friend of mine. . . . I'm going to talk to [him] to see if he can help you out because the truth is that I don't sell this, and I'm not involved in this, and I don't know if he could help you, but I could see him and ask him.

2 T. at 73–75. Rodriguez further testified that he then relented to the extent of giving Cepero his telephone number "so that he could inquire whether my friend could get it." *Id.* at 76.

Between the time of this initial conversation and Rodriguez's arrest the following day, Cepero telephoned Rodriguez four times. All of their telephone conversations, as well as their face-to-face exchanges on January 16, were recorded by Cepero at the DEA's behest. Consequently, the contents of those discussions are not in dispute. In the first conversation, appellant told Cepero that he had made a call to see about getting the "cassette," and was awaiting a response.[3] Cepero called back. Upon appellant's statement that he had located a "good cassette," the informer asked to purchase a "big cassette" (a kilogram of cocaine). Appellant told Cepero to call again in half an hour; he would then specify where the goods would be provided. The next call was answered by a woman who said that Rodriguez was unavailable. Later that evening, Cepero and appellant spoke once more. They agreed to meet at the market on the following day so that appellant's source could make the delivery.

The meeting began as scheduled. The men trooped to the market's parking lot, where appellant introduced Cepero to one Rubil Nova. Having performed this amenity, Rodriguez returned to work, leaving the two together. Later that afternoon, Cepero sought out Rodriguez and inquired why Nova had not yet returned with the narcotics. At that precise moment, Nova came into view. Rodriguez accompanied Cepero as far as the supermarket's entrance. From there, Cepero journeyed forth alone to meet Nova and appellant went back to work. Cepero transferred the cocaine

___

**3.** Rodriguez testified that Cepero had instructed him to use a code wherein cocaine was described in "cassette" parlance. *See, e.g.,* 2 T. at 74.

from Nova's car to his own car, at the latter's instruction. The pair then entered Nova's vehicle. The denouement followed swiftly: Cepero signalled the waiting DEA agents, Nova and Rodriguez were arrested, and the cocaine was confiscated.

## II. ENTRAPMENT

Without further ado, we turn to appellant's flagship claim: that the district court wrongfully refused to charge the jury on his main theory of defense.

### A. *Standard of Review.*

█ The decisions are in some disarray as to the criterion to be used in reviewing a district court's failure to give a jury instruction on entrapment. At least one circuit applies an "abuse of discretion" standard. *See United States v. Fleishman,* 684 F.2d 1329, 1342 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). We disagree.

It is hornbook law that an accused is entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it. *See United States v. Silvestri,* 790 F.2d 186, 192 (1st Cir.), *cert. denied,* 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986); *United States v. Zeuli,* 725 F.2d 813, 817 (1st Cir.1984). In determining whether that is the case, the district court is not allowed to weigh the evidence, make credibility determinations, or resolve conflicts in the proof. Rather, the court's function is to examine the evidence of record and the inferences reasonably to be drawn therefrom to see if the proof, taken most hospitably to the accused, can plausibly support the theory of defense. In that sense, the district court's task bears a resemblance to its function in determining whether or not a directed verdict or judgment of acquittal should be ordered. *See, e.g., Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987) (directed verdict); *United States v. Systems Architects, Inc.,* 757 F.2d 373, 377 (1st Cir.) (judgment of acquittal), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985). Because such a decision entails not differential fact-finding, but merely an inquiry into the legal sufficiency of the evidence, the standard of appellate review, it seems to us, should be plenary. *Accord United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir.1986); *see also United States v. Nations,* 764 F.2d 1073, 1080–81 (5th Cir.1985) (applying plenary standard of review sub silentio).

### B. *Historical Perspective.*

The defense of entrapment has two elements: (1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct. *Mathews v. United States,* —— U.S. ——, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Polito,* 856 F.2d 414, 415–16 (1st Cir.1988); *United States v. Coady,* 809 F.2d 119, 122 (1st Cir.1987). In *Mathews,* the Court reminded us that predisposition is "the principal element in the defense of entrapment," *Mathews,* 108 S.Ct. at 886 (quoting *United States v. Russell,* 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)), and that it "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal'...." *Id.* Although "[t]he question of entrapment is generally one for the jury," *id.,* that is not invariably so. Entrapment comes into play only when the accused has successfully carried what we have termed an "entry-level burden." *Coady,* 809 F.2d at 122. To bear that burden, defendant must proffer some preliminary showing "that a government agent turned him from a righteous path to an iniquitous one." *Id.*

Some twenty years ago, we plotted the continuum along which the entry-level burden falls: "the amount [of evidence] need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal, but it must be more than a mere scintilla." *Kadis v. United States,* 373 F.2d 370, 374 (1st Cir.1967) (citations omitted). We know that the "initial showing necessitates some evidence on each of the two prongs of the [entrapment] defense: inducement and unreadiness." *Polito,* at 416. Yet, the precise dimensions of this burden of production remain inexact; we have estab-

lished "no bright-line rule in this circuit as to the quantum of proof which will enable the proponent to cross the threshold and warrant a charge to the jury on entrapment." *Id.* at 416. Our opinions, by and large, have nibbled around the definitional edges, often instructing by negative implication. They teach us, for instance, that an "accused's subjective belief that the authorities will welcome his criminality" is insufficient. *Polito,* at 417. So is a showing of "mere solicitation." *See, e.g., Coady,* 809 F.2d at 122; *United States v. Espinal,* 757 F.2d 423, 425–26 (1st Cir.1985). Similarly, the threshold is not overcome by a defendant's "conclusory and self-serving statements." *United States v. Kakley,* 741 F.2d 1, 4 (1st Cir.), *cert. denied,* 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984). And it is not enough simply that the government "afford[ed] the defendant the opportunity for commission of the offense." *United States v. Fera,* 616 F.2d 590, 596 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980).

In a lengthy litany of cases, it has proven unnecessary to develop a more meticulous definition. We have not had occasion to delineate what evidence actually suffices to meet the defense's burden of production, because whatever the high point of the threshold might theoretically require, the particular defendant has not hoisted himself to the low end. *See, e.g., Polito,* at 416 (evidence "amounts to zero—or so near to zero as to constitute less than the merest imaginable scintilla"); *United States v. Murphy,* 852 F.2d 1, 5 (1st Cir.1988) ("however lenient the standard we apply here, the appellants cannot meet it"); *Coady,* 809 F.2d at 122 (noting "utter absence" of proof of unreadiness or inducement). But this case trenches close to the line; it is, at least, sufficiently near the border to require an attempt to size more precisely the entry-level burden.

### C. *Dimensions of the Entry–Level Burden.*

■ We start with what, in our view, is bedrock: despite all the ruffles and flourishes which have attended its emergence, the defense of entrapment stands on no different footing than most other theories of criminal defense. That being so, reason suggests that we should look no further than the age-old doctrine that "a party is not entitled to a charge unless the record, viewed most charitably to the proponent of the instruction, furnishes an arguable basis for application of the proposed rule of law." *Coady,* 809 F.2d at 121. *See also United States v. Mitchell,* 495 F.2d 285, 287–88 (4th Cir.1974) (instructions on a defense must be given so long as "there was a foundation in the evidence for them"); *United States v. Megna,* 450 F.2d 511, 513 (5th Cir.1971) (similar).

In *Mathews,* the Court recently indicated its approval of such a rule in connection with an entrapment defense. 108 S.Ct. at 887. In support of this "general proposition," the *Mathews* Court cited 4 C. Torcia, *Wharton's Criminal Procedure* § 538, at 11 (12th ed. 1976) to the effect that "[a] requested instruction on a party's . . . theory of defense must be given if such theory is fairly supported by the evidence." The Court also cited *Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896). *Stevenson* spoke to a closely analogous matter—the evidentiary predicate necessary for a criminal defendant to receive a lesser-included-offense instruction—stating that "if there be any evidence fairly tending to bear upon the [lesser offense], it is the province of the jury to . . . say whether the crime was [the greater or the lesser]." *Id.* at 323, 16 S.Ct. at 843. We think the drift of *Mathews* is fully consistent with our requirement of an entry-level burden, but that the resultant principle cannot be sliced more finely.

If an accused suggests that entrapment belongs in the case, it seems not unfair to expect him to point to a modicum of evidence supportive of his suggestion. *Accord United States v. Rivera,* 855 F.2d 420, 423–24 (7th Cir.1988); *United States v. El–Gawli,* 837 F.2d 142, 145 (3d Cir. 1988), *petition for cert. filed* (April 19, 1988); *United States v. Akinseye,* 802 F.2d 740, 743 (4th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); *United States v. Fischel,* 686 F.2d

1082, 1085 (5th Cir.1982); *cf. Lopez v. United States*, 373 U.S. 427, 434–35, 83 S.Ct. 1381, 1385–86, 10 L.Ed.2d 462 (1963) ("before the issue of entrapment can fairly be said to have been presented in a criminal prosecution there must have been at least some showing of the kind of conduct by government agents which may well have induced the accused to commit the crime"). The alternative—that the prosecution be forced to disprove entrapment in *every* case—seems plainly unacceptable. Moreover, placing such a limited burden on a criminal defendant is by no means unprecedented. *See, e.g., Simopoulos v. Virginia*, 462 U.S. 506, 510, 103 S.Ct. 2532, 2536, 76 L.Ed.2d 755 (1983) ("Placing upon the defendant the burden of going forward with evidence on an affirmative defense is normally permissible."); *United States v. Dworken*, 855 F.2d 12, 20–21 (1st Cir.1988) (discussing defendant's burden of production on defense of abandonment); *United States v. Hoffman*, 832 F.2d 1299, 1303 n. 4 (1st Cir.1987) (discussing defendant's burden when a Sixth Amendment claim of witness intimidation is lodged); *United States v. Pasarell*, 727 F.2d 13, 14 (1st Cir.) (discussing defendant's burden vis-a-vis insanity defense), *cert. denied*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984); *United States v. Saade*, 652 F.2d 1126, 1135 (1st Cir.1981) (discussing defendant's burden in connection with claim of vindictive prosecution).

Our conclusion that the accused's burden of production is measured by the time-honored sufficiency-of-the-evidence yardstick—no more, no less—derives support from the entrapment caselaw as well. Even before *Mathews* was decided, other circuits came to treat entrapment as a garden-variety theory of affirmative defense for purposes of delineating what was needed to frame a jury question. *See, e.g., United States v. Fadel*, 844 F.2d 1425, 1430 (10th Cir.1988); *United States v. Nations*, 764 F.2d at 1081; *United States v. McLernon*, 746 F.2d 1098, 1110–11 (6th Cir.1984). We agree with the Tenth Circuit that:

> The quantum of evidence required to submit an entrapment defense to a jury has been described as 'any evidence,'

'some evidence,' 'slight evidence,' and 'more than a scintilla.' We believe these phrases are not useful because the ultimate test is whether the evidence (regardless of amount) creates a fact issue requiring submission to the jury.

*Ortiz*, 804 F.2d at 1166 n. 4.

▬ Therefore, we hold that a defendant is entitled to a jury instruction on entrapment if there is record evidence which fairly supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it. As with other defenses, a defendant may shoulder this burden of production by pointing to evidence adduced during the government's case, by introducing evidence to his own behoof, by relying on some combination of the foregoing, or otherwise by reference to any probative material in the record. *See United States v. Barry*, 814 F.2d 1400, 1402 (9th Cir.1987); *Ortiz*, 804 F.2d at 1164; *cf. United States v. Luce*, 726 F.2d 47, 49 (1st Cir.1984) (defendant has initial burden to show, "through government witnesses or otherwise," some evidence of unreadiness). Such proof may, of course, be circumstantial rather than direct. *Polito*, at 416. When all is said and done, however, there must be some hard evidence in the record which, if believed by a rational juror, would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit. The existence or nonexistence of such a quantum of evidence in a given case is, we think, a matter of law for the court. *Accord United States v. Jannotti*, 729 F.2d 213, 224 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *United States v. Wolffs*, 594 F.2d 77, 80 (5th Cir.1979). *Cf. Mathews*, 108 S.Ct. at 888 (remanding for court to determine whether "evidence at trial was insufficient to support an instruction on ... entrapment").

### D. *Burden of Proof.*

▬ We pause at this point to make crystal clear that the defendant's burden of production does not shift the historic bur-

den of proof. Once the defense is properly in the case, the government is obligated to prove beyond a reasonable doubt that no entrapment occurred. *Polito*, at 416; *see also United States v. El–Gawli*, 837 F.2d at 145; *United States v. Rubio*, 834 F.2d 442, 450 (5th Cir.1987); *United States v. Barry*, 814 F.2d at 1402; *Kadis v. United States*, 373 F.2d at 374. The prosecution carries the burden with respect to both elements of the defense: inducement and unreadiness. But, since entrapment cannot occur unless both elements coincide, the defense fails if the jury is persuaded beyond reasonable doubt that *either* is lacking in a particular case. *See Rivera*, 855 F.2d at 423; *El–Gawli*, 837 F.2d at 147.

### E. Application of the Standard.

■ Having cut a passable path through this conceptual thicket, we now apply the standard. Viewing the evidence in this case most favorably to appellant (as we must), we believe a reasonable juror could have determined that Rodriguez was entrapped. Accordingly, the district court erred in refusing to give the requested charge.

The question, admittedly, is close. Yet we think that, if the venire credited appellant's version of his initial conversation with Cepero (who for our purposes must be viewed as a government actor), and drew each and every reasonable inference therefrom in the light most flattering to him, there was a sufficient showing of both inducement (*e.g.*, Cepero designed the plan, created the opportunity for defendant's participation, made the initial approach, solicited defendant forcefully, and displayed dogged insistence until Rodriguez capitulated) and lack of predisposition (*e.g.*, defendant, who had no past record of trafficking nor any proven connection with prior drug deals, repeatedly refused to participate in this one, protested his ignorance of the matter, and in the end, reluctantly agreed to make an ill-advised inquiry). To

be sure, Rodriguez's account need not have been believed—but, in the circumstances of this case, its creditworthiness was not for the district court to assess in passing upon the request to charge. In the same vein, we recognize that Rodriguez's soliloquy was self-serving—but realistically, how better than through his own testimony can a defendant meet his entry-level burden? It is common wisdom—yet an uncommonly wise rule of law—that the testimony of a single witness is sufficient for proof of a discrete fact. *See* 7 Wigmore, *Evidence* § 2034, at 343 (1978). The rule, we believe, should be no different here.

We do not mean to suggest that a court must give weight to allegations which are intrinsically improbable or flatly contradicted by irrefutable evidence. Nor do we insist that vague or conclusory statements —though they come from the mouth of the accused—are sufficient to raise a genuine question of material fact. That is not the case. *E.g., Kakley*, 741 F.2d at 4; *Tzimopoulos v. United States*, 554 F.2d 1216, 1217 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). But here, Rodriguez's version, whether or not it strikes us as particularly credible, is neither thoroughly implausible nor constructed entirely of gauzy generalities.[4] To the contrary, the defendant's account is interlaced with considerable detail and has some circumstantial corroboration in the record. If that testimony were believed—and we intimate neither that it was nor was not worthy of credence—Cepero's conduct could, we think, constitute inducement.

On its facts, this case readily distinguishes itself from the clutch of prior cases mentioned above. Unlike in *Murphy*, where the defendant broached the subject of an arms deal with the government agent, 852 F.2d at 5, Cepero first raised the subject of a drug deal with appellant. Unlike in *Espinal*, where there was only "simple evidence of solicitation," 757 F.2d at 425, Cepero allegedly made incessant and

---

**4.** Appellant's statements (a) that the government informant "went on insisting", 2 T. at 75, (b) that it was presumably unlawful "to induce a person to commit a crime that [Cepero] did with me," *id.* at 78, and (c) that Cepero "placed this [participation in the drug deal] in my mind," *id.* at 81, are admittedly conclusory. We disregard these lagniappes in making our finding that there was enough evidence to warrant sending the entrapment issue to the jury.

insistent demands, securing appellant's co-operation only after the informer offered to make all the arrangements, suggested a failsafe code for facilitating the transaction, and dangled assorted blandishments. Unlike in *Coady*, where the defendant "leaped" at the proffered opportunity and "immediately" agreed to the nefarious scheme, 809 F.2d at 121–22, Rodriguez displayed considerably more disrelish, including repeated denials of any familiarity with trafficking and repeated refusals to participate in Cepero's plan. As we have said before: "Evidence that the defendant resisted the criminal suggestion raises [a jury] question whether his hesitation exhibited the conscience of the upright, or merely the circumspection of the criminal." *Kadis*, 373 F.2d at 374.

There were other, extrinsic signs of unreadiness as well. As opposed to many similar cases, there was no evidence at all of any previous criminal involvement on appellant's part—let alone any involvement in drugs. He was steadily employed in an honest job. There was no proof of high living. In short, apart from the suspect transaction itself, there was nothing in Rodriguez's prior history which hinted that he was disposed to traffick in cocaine. Moreover, as appellant tells it, even after his will was overborne, he agreed only to inquire whether an acquaintance of his might sell drugs and to allow Cepero to telephone him at home to pursue the matter. Taking all of this into account, we find that there was sufficient evidence of both inducement and lack of predisposition from which a rational juror could derive a reasonable doubt as to whether or not the appellant was entrapped.

We reach this conclusion despite the subsequent conversations between appellant and Cepero, and despite appellant's eventual role in the aborted transaction. If entrapment occurred in this case, it took place at the initial meeting. And while later events often may shed light on earlier motivations, *see, e.g., United States v. DiZenzo*, 500 F.2d 263, 265 (4th Cir.1974) (conversations which took place after offense held relevant on issue of intent); *cf. Dial v. Travelers Indemnity Co.*, 780 F.2d 520, 523 (5th Cir.1986) (in civil litigation, evidence of subsequent conduct ruled relevant on issue of intent in respect of arson defense to fire insurance claim), the unfolding evidence in this case is well shy of conclusive. Although a jury might well find that Rodriguez's wiliness, and the level of experience and enthusiasm which he subsequently exhibited, were inconsistent with the claim of initial unreadiness, such a finding would not be inevitable. It is, after all, sometimes said that there is no one as devoted to a cause as a hard-won convert. It seems to us that it would be possible for a reasonable jury to find that the evidence indicated only that appellant, after succumbing to the agent's inducements and overcoming his own initial lack of predisposition, learned his lessons well and carried out his end of the bargain exuberantly.

In sum, we conclude that while the jurors certainly were at liberty to disbelieve Rodriguez's lament that he was entrapped, they should have been given the opportunity to pass upon it.

## III.  MULTIPLICITY

■ The remaining ground of appeal relates to what Rodriguez urges was an impermissible overlap between Count I (which charged conspiracy) and Count II (which, among other things, charged aiding and abetting).[5] We conclude without serious question that conspiracy, on the one hand, and aiding and abetting, on the second hand, are separate and distinct crimes which, although predicated on essentially the same conduct, may be charged simultaneously in a single indictment.

■ We note, early on, that Rodriguez's multiplicity claim strikes us as doubly defaulted. First, such a claim—insofar as it relates to the indictment itself—should have been raised in the district court before trial. *United States v. Serino*, 835 F.2d 924, 929–30 (1st Cir.1987); *United States v. Sheehy*, 541 F.2d 123, 130 (1st Cir.1976). Because the claim was not

---

5. The architecture of the indictment is spelled out in greater detail in note 1, *supra*.

so raised, it has been forfeited. And secondly, insofar as the claim is one of instructional error, no objection was interposed on this basis to the judge's charge. Thus, we cannot inquire into the niceties of the instructions. *See United States v. Griffin,* 818 F.2d 97, 99–100 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *see also* Fed.R.Crim.P. 30.[6] Most importantly, however, we are persuaded that there is no fundamental problem with the charges as pled.

The litmus test for multiplicitousness is well settled:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Conspiracy requires proof of an element foreign to aiding and abetting:

> [A]greement remains the essential element of the crime [of conspiracy], and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact....

*Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1290 n. 10, 43 L.Ed.2d 616 (1975) (citations omitted); *see also United States v. Herbert,* 698 F.2d 981, 985 (9th Cir.) ("offense of conspiracy is separate from an offense of aiding and abetting"), *cert. denied,* 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983).

Based on these authorities, we are confident that there is a sound conceptual basis for charging conspiracy and aiding and abetting distinctly, notwithstanding that both charges pertain to the same transaction. The indictment as framed was not multiplicitous, and raised no double jeopardy concerns. Because that is so, and because there must be a retrial, *see infra* Part II(E), we need not address the claim of *instructional* error in any detail. We

are confident that the distinction can, and will, properly be maintained in the district court's charge on retrial.

## IV. CONCLUSION

We need go no further. Because the defendant was entitled to, but did not receive, a jury charge on entrapment, his conviction cannot stand. Accordingly, we set aside the judgment below and order a new trial.

VACATED AND REMANDED.

---

6. We take no view of the charge actually given at the trial, except to remark that the challenged instructions seem easily to pass the limited perscrutation which the plain error rule affords.