USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-2313 UNITED STATES OF AMERICA, Appellee, v. CHADWICK ROGERS, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ ____________________ Before Selya and Boudin, Circuit Judges, ______________ and McAuliffe,* District Judge. ______________ ____________________ David Michael with whom J. Tony Serra, James Bustamante and ______________ ______________ _________________ Serra, Lichter, Daar, Bustamante & Michael were on briefs for _____ _______________________________________ appellant. Patrick M. Hamilton, Assistant United States Attorney, with whom ___________________ Donald K. Stern, United States Attorney, and William F. Sinnott, ________________ ___________________ Assistant United States Attorney, were on brief for the United States. ____________________ December 23, 1996 ____________________  ____________________ *Of the District of New Hampshire, sitting by designation. BOUDIN, Circuit Judge. Chadwick Rogers was convicted of _____________ conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. 846 and 841(a)(1), and certain of his property was ordered forfeited pursuant to 21 U.S.C.  853. Rogers appeals, contesting both the conviction and forfeitures. We set forth a summary of salient events, deferring certain details pertinent to specific issues.  In May 1992, Michael Cunniff, an undercover agent of the Drug Enforcement Administration, was introduced to Howard Oberlander in Danvers, Massachusetts. Oberlander told Cunniff that he was interested in purchasing 500 pounds of Thai marijuana with the assistance of another individual (who later turned out to be Rogers). During this meeting, Oberlander telephoned Rogers twice, and Rogers agreed to a meeting near Rogers' ranch in California, north of San Francisco, to arrange the purchase. Several days later, Oberlander gave Cunniff $20,000 as a good faith down payment. Then, on June 18, 1992, both men met Rogers in California at a neutral location. Rogers told Cunniff that he had not traded "this kind of product" recently because of the risk of sting operations. Rogers said that he had an underground storage site at his ranch for concealing the marijuana and invited Cunniff to see the ranch. -2- -2- At Rogers' ranch, Rogers gave Cunniff a tour of the premises. Rogers asked Cunniff to provide some of the marijuana on credit, offering as collateral gold, a diamond, and the title to a motor home parked on the property. Oberlander gave Rogers a small sample of the marijuana that Cunniff had earlier provided to Oberlander. The meeting ended without a final agreement between Rogers and Cunniff on the terms of the sale. On the following day, Oberlander and Cunniff returned to Rogers' ranch. Rogers agreed to the terms of the sale to complete the transaction. Those terms, discussed in intervening telephone calls, were that Cunniff would "front" the entire 500-pound shipment of marijuana in return for the collateral that Rogers had offered. But during this second visit, Rogers noticed an airplane circling over the ranch and told Oberlander and Cunniff to leave for dinner and return later that evening. The airplane was a DEA surveillance plane, which followed Cunniff's car as he and Oberlander drove away from the ranch. From a gas station, Oberlander telephoned Rogers, who said that the plane had followed Cunniff's car and that law enforcement agents had probably planted a tracking device in the car. Rogers told Oberlander that he did not want to complete the transaction, that Oberlander and Cunniff should -3- -3- leave town and (according to Rogers' testimony) that Rogers never wanted to see them again. Cunniff then met with surveillance agents and had Oberlander arrested. Cunniff and more than two dozen DEA and local agents returned to Rogers' ranch and arrested Rogers pursuant to a federal arrest warrant. Earlier that day, agents had also obtained a search warrant authorizing the seizure of property intended to be used to commit federal drug offenses. Pursuant to this search warrant, the agents searched Rogers' ranch and discovered the hidden underground bunker.  During the search, agents pressed Rogers to cooperate,  although he had said that he wished to remain silent. After being held at his ranch in handcuffs for over two hours, Rogers revealed the location of a hidden floor safe, built underneath a desk in his library. The agents opened the safe, which contained currency, a large diamond ring, and gold Krugerrands worth about $5,000. After a jury trial, Rogers was convicted of conspiracy to possess marijuana with intent to distribute. The jury then considered the forfeiture count in a bifurcated hearing, and in accord with the jury's special verdict the following property was forfeited: Rogers' ranch and adjoining real property, the motor home, a dozen gold Kruggerands, and the diamond. The judge imposed a sentence of 90 months -4- -4- imprisonment and a $12,500 fine. Rogers now appeals both the conviction and sentence. 1. Rogers' first claim, addressed to his convictions, rests on the premise that he withdrew from the conspiracy by telling Cunniff and Oberlander to leave town and not contact him again. His own unrebutted testimony, Rogers says, required the district court to grant his motion to dismiss under Fed. R. Crim. P. 29, and, alternatively, supported Rogers' request for an instruction to the jury that withdrawal from the conspiracy constituted an affirmative defense to the charge. The district court had refused both applications. In addition to procedural objections, the government protests that the evidence does not come close to establishing a bona fide withdrawal from the conspiracy. Rogers, it says, was merely deferring efforts to transfer the drugs or was feigning withdrawal. Still, if Rogers' testimony were believed by the jury, the jury might find a withdrawal by Rogers grounded in "a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." United States v. Juodakis, 834 _____________ ________ F.2d 1099, 1102 (1st Cir. 1987). But withdrawal is not a defense to a conspiracy charge if the conspiracy violation has already occurred. "The traditional rule here `is strict and inflexible: since the -5- -5- crime is complete with the agreement, no subsequent action can exonerate the conspirator of that crime.'" 2 W. LaFave & A. Scott, Substantive Criminal Law 6.5 (1986) (quoting ALI, ________________________ Model Penal Code 5.03, comment at 457 (1985)). See, e.g., ________________ ___ ____ United States v. Nava-Salazar, 30 F.3d 788, 799 (7th Cir.), _____________ ____________ cert. denied, 115 S. Ct. 515 (1994). Some statutes require ____________ an overt act, but section 846 does not. See United States v. ___ _____________ Shabani, 115 S. Ct. 382, 385 (1994). _______ True, withdrawal may carry a variety of advantages for a defendant. It may insulate him from Pinkerton liability for _________ substantive crimes of others that occur after his withdrawal. United States v. O'Campo, 973 F.2d 1015, 1021 (1st Cir. ______________ _______ 1992). It can prevent admission against him of statements by co-conspirators made after this point. E.g., United States ____ _____________ v. Abou-Saada, 785 F.2d 1, 8 (1st Cir.), cert. denied, 477 __________ ____________ U.S. 908 (1986). It will normally start the running of the statute of limitations. E.g., United States v. Sax, 39 F.3d ____ _____________ ___ 1380, 1386 (7th Cir. 1994). But none of these rubrics applies in this case. Rogers contends that two of our earlier decisions-- United States v. Piva, 870 F.2d 753 (1st Cir. 1989), and ______________ ____ United States v. Dyer, 821 F.2d 35 (1st Cir. 1987)--create an _____________ ____ exception in the First Circuit to the usual conspiracy rules. These cases, he says, make withdrawal an affirmative defense even if the conspiratorial agreement has already been made. -6- -6- And he urges that recognizing such a defense serves public policy by encouraging withdrawal from conspiracies. We agree with Rogers that Dyer and Piva contain some ____ ____ ambiguities. But neither case offers a square holding in Rogers' favor, and such a holding would be flatly inconsistent with the settled view that a conspiratorial agreement is itself a punishable act because of the dangers created by such a criminal enterprise. United States v. _____________ Moran, 984 F.2d 1299, 1302-03 (1st Cir. 1993). If there has _____ been a misunderstanding, it is now resolved. 2. Rogers claims that the district court erred in refusing to give the jury an instruction on entrapment. A defendant is entitled to such an instruction if the evidence, viewed in the light most favorable to the defendant, would "create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit." United States v. Rodriguez, 858 _____________ _________ F.2d 809, 814 (1st Cir. 1988). This elliptical summary condenses two different matters--one of substance and the other of proof. The first substantive element of an entrapment claim is made out where a government agent exerts undue pressure or _____ inducement to persuade the defendant to commit the crime. United States v. Acosta, 67 F.3d 334, 337 (1st Cir. 1995), ______________ ______ cert. denied, 116 S. Ct. 965 (1996); United States v. _____________ ______________ -7- -7- Gendron, 18 F.3d 955, 961-62 (1st Cir.), cert. denied, 115 S. _______ ____________ Ct. 654 (1994). In addition, even undue pressure or inducement is irrelevant where the defendant was already predisposed to commit the crime. Thus, lack of predisposition is the second substantive element of entrapment. Gendron, 18 F.3d at 962. _______ As to proof, the defendant must make a threshold showing in order to raise the entrapment issue; after that, the burden shifts to the government to negate entrapment by proving, beyond a reasonable doubt, that no improper pressure or inducement was used or that the defendant was predisposed __ to commit the offense. Acosta, 67 F.3d at 338. But ______ entrapment may not be argued, nor is any instruction required, unless the defendant points to evidence that, if believed by the jury, would permit such a reasonable doubt on both elements. Rodriguez, 858 F.2d at 814. _________ In this case, when Rogers asked for an entrapment instruction, the district court after the close of the evidence ruled that there was enough evidence to permit the jury to have a reasonable doubt as to Rogers' predisposition. This might seem surprising in view of Rogers' apparent sophistication and his underground bunker. But Rogers himself testified that he had never been a marijuana dealer, and issues of credibility are largely for the jury. In all events, the government does not contest the point. -8- -8- The district court also ruled, however, that there was no threshold-level evidence that the government had used improper pressure or inducement to cause Rogers to commit the crime; and on that ground it refused to give an entrapment instruction. We review such rulings de novo, Rodriguez, 858 _______ _________ F.2d at 812, so the question for us is the same: whether, viewing the evidence in the light most favorable to Rogers, there was enough evidence of improper pressure or inducement to take the issue to the jury.  Rogers' most direct route to the necessary showing was his own trial testimony that Oberlander had hassled and harangued him. Since most of their conversations were unrecorded and Oberlander was not a cooperating government witness, the government could not directly refute this testimony. But the entrapment "defense" applies only if the improper inducement derives from the government. E.g., ____ United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987). ______________ _____ Otherwise, the defendant has available only more difficult- to-prove defenses such as coercion and necessity which were not invoked by Rogers in this case.  Rogers' response is that Oberlander should be treated as an "unwitting government agent." See United States v. ___ ______________ Valencia, 645 F.2d 1158, 1168-69 (2d Cir. 1980); Note, 95 ________ Harv. L. Rev. 1122 (1982). This is an image likely to ______________ mislead the reader. Under the case law the government would -9- -9- be responsible if Cunniff told Oberlander to apply the ____ pressure or inducement later deemed improper, and perhaps if Cunniff knowingly tolerated it, but not if Cunniff were ignorant of it. United States v. Bradley, 820 F.2d 3, 8 (1st _____________ _______ Cir. 1987). The district court ruled that there was insufficient evidence associating Cunniff with any such conduct by Oberlander. We agree. Assuming that Oberlander did act improperly, nothing in the record shows that Cunniff urged, suggested or was even aware of such conduct. About the worst that emerges is a single statement by Cunniff, telling Oberlander to "put some heat on [Rogers]." This statement was made as Cunniff and Oberlander drove away from the ranch after their first visit when negotiations had bogged down over whether Cunniff would "front" the drugs or obtain payment from Rogers. The comment is far less sinister than the suggestion of an agent that the intermediary put "the arm" on a target, Bradley, 820 _______ F.2d at 7, a phrase implying force or the threat of force. In the alternative, Rogers contends that the undisputed facts alone were enough to get to the jury on entrapment, in part because the government "targeted" Rogers and pursued him with excessive zeal. But the DEA did not seek out Rogers as an individual--Oberlander did--and based on a few telephone calls, Rogers proved ready enough to enter into talks. His only resistance was not to the idea of the crime, but rather -10- -10- to the risks and the terms. That the negotiations took a good many calls proves nothing. See United States v. ___ ______________ Gifford, 17 F.3d 462, 468 (1st Cir. 1994).  _______ The other strand to Rogers' undisputed-facts argument is that the terms offered were unduly attractive: that Thai marijuana was an attractive product that was hard to obtain, that it was offered to Rogers on credit for collateral (the gold, diamond and motor home) valued at "about 20 to 25 percent of the value of the marijuana," and that Rogers stood to profit by as much as 10 to 20 percent of the sales price. This, says Rogers' brief, was "an irresistibly lucrative deal for a rare and highly prestigious product at a `cheap' price." The fact that the product was rare is of little help to Rogers; a receiver of stolen art can certainly be tempted with a Rembrandt. Something more might be made--in an extreme case--of extraordinarily favorable terms of credit or a price drastically below market levels. E.g., United States ____ _____________ v. Casanova, 970 F.2d 371, 376 (7th Cir. 1992). But it is ________ enough to say that Rogers offered no substantial evidence, only lawyer's conjecture, that the deal was irresistibly attractive. Compare United States v. Mosley, 965 F.2d 906, _______ _____________ ______ 913 (10th Cir. 1992). 3. Rogers' final attack on his conviction concerns the admission of items recovered from his safe. The most -11- -11- damaging were a diamond and a number of Krugerrands; their presence dovetailed with Cunniff's testimony that Rogers had offered such items, along with the motor home, as collateral for the drugs. Although Rogers moved to exclude the evidence as illegally seized, the district court denied the motion after a pre-trial hearing. The district court first ruled that the discovery of the safe was the product of illegal questioning. Although Rogers had been given Miranda warnings, the court found that the _______ agents had continued to press Rogers after he sought to remain silent. However, the court also found that the large team of about two dozen agents, who were searching the premises under a search warrant, would have found the safe without Rogers' help; the court therefore admitted the evidence under the "inevitable discovery" doctrine. Nix v. ___ Williams, 467 U.S. 431 (1984). ________ The safe was concealed in the concrete floor of Rogers' library, covered by a built-in desk and drawer. Whether the safe could have been located short of tearing up the desk is not clear from the record. Rogers says that the agents were abandoning the search when Rogers revealed the safe's location. The government, by contrast, stresses the large number of agents in the search; their success in discovering the concealed underground storage bunker; their knowledge of -12- -12- the diamond and gold; and the inferred likelihood that absent Rogers' help the search would have continued. The term "inevitable," although part of the Nix ___ doctrine's name, is something of an overstatement. The facts of Nix itself--a body hidden in an area of many square miles- ___ -show that what is required is a high probability that the evidence would have been discovered by lawful means. See ___ also United States v. Procopio, 88 F.3d 21, 27 (1st Cir.) ____ _____________ ________ petition for cert. filed (Nov. 7, 1996) (No. 96-6664). The ________________________ probability has not been quantified, but it only confuses matters to pretend that the government must prove to a certainty what would have happened but for the illegally obtained admission. Normally, on a close question like this, a reviewing court will defer to the trial court where the latter has made a fact-intensive judgment (here, as to the likelihood of independent discovery) resting on a plausible view of the evidence. United States v. McLaughlin, 957 F.2d 12, 16 (1st _____________ __________ Cir. 1992). The Supreme Court's recent decision in Ornelas _______ v. United States, 116 S. Ct. 1657, 1663 (1996), insisting on _____________ de novo review of a probable cause finding, concerned an ________ issue that was more clearly a matter of law application. But we do have some concern about Rogers' unanswered claim, debatably supported by a record citation, that the search was being abandoned when Rogers revealed the sale. -13- -13- Rather than pursue this loose end, we affirm instead on the ground that if admission of the evidence was error, it was harmless beyond a reasonable doubt. Chapman v. _______ California, 386 U.S. 18 (1967). The government's case was __________ straightforward, based on direct testimony from Cunniff and buttressed by tape recordings and telephone records. Moreover, Rogers did not deny most of what Cunniff related. Instead, Rogers sought to convince the jury that he had been play-acting and intended only to string Cunniff along until Oberlander recovered his $20,000 downpayment. Against this background, the diamond and gold coins added color but very little more to the government's case. Rogers asserts that this evidence undermined his claim that he was only pretending an interest in buying drugs, but it is difficult to see why this is so. Even a pretending drug purchaser--for reasons of prudence alone--would have ample reason to name collateral that could be produced if a demand to see it were made. With or without physical evidence of the collateral, Rogers' defense of pretense was simply implausible. 4. Rogers' remaining claims concern the forfeitures of the ranch, the diamond, the gold Krugerrands, and the motor home. Criminal forfeiture in drug cases is covered by 21 U.S.C. 853, which provides that any person convicted of a specified set of offenses shall forfeit proceeds obtained -14- -14- from the violation and property of the defendant used or intended to be used to commit or facilitate the violation. Rogers contests the judgment of forfeiture on three different grounds.  First, Rogers contends that the district court should have instructed the jury that the facts to support the forfeiture must be found beyond a reasonable doubt; instead, the judge told the jury to use a preponderance of the evidence standard to find the facts incident to the forfeiture. This lesser standard, of course, is directed only to facts other than the predicate finding that the defendant had engaged in a drug crime, an issue which is ordinarily resolved by the criminal conviction itself. By practice, criminal forfeitures are determined by the jury. The Federal Rules of Criminal Procedure provide that the indictment or information must allege the interest or property subject to criminal forfeiture and that a "special verdict" shall be returned as to the extent of the interest or property subject to forfeiture, if any. See Fed. R. Crim. ___ P. 7(c)(2), 31(e). Nevertheless, the Supreme Court has concluded that the forfeiture is part of the sanction or penalty and not an independent offense. Libretti v. United ________ ______ States, 116 S. Ct. 356, 363 (1995); cf. 21 U.S.C. 853(a) ______ ___ (final paragraph). -15- -15- Against this background, almost every circuit that has pronounced on the issue has held the standard of proof as to forfeiture issues under section 853 (other than the proof of a predicate violation) is a preponderance of the evidence. See, e.g., United States v. Tanner, 61 F.3d 231, 234-35 (4th ___ ____ _____________ ______ Cir. 1995), cert. denied, 116 S. Ct. 925 (1996) (citing _____________ numerous cases). The principal reason given by the decisions is that findings relating to penalty or sanction are a part of sentencing; and sentencing determinations are traditionally based on a preponderance, not on proof beyond a reasonable doubt. United States v. McCarthy, 77 F.3d 522, ______________ ________ 525 (1st Cir.), cert. denied, 65 U.S.L.W. 3368 (Nov. 18, ____________ 1996) (No. 95-9302). Although Congress could provide for a more stringent standard, it has certainly not done so in section 853. On the contrary, it has adopted (in 21 U.S.C.  853(d)) a presumption provision whose terms suggest that Congress assumed that a preponderance standard would be used in deciding forfeiture issues under that section. See United ___ ______ States v. Elgersma, 971 F.2d 690, 694-95 (llth Cir. 1992). ______ ________ Still, Congress' assumptions are not enactments, and one could argue that Congress left the burden of proof issue to the judiciary, as it does with many procedural details.  If so, we see no reason to depart from the consensus view that criminal forfeiture, being a penalty or sanction issue under section 853, is governed by the same -16- -16- preponderance standard that applies to all other sentencing issues. The happenstance that the issue is submitted to the jury may complicate the process of instructing jurors and has been offered as a reason for bifurcating the trial. United ______ States v. Desmarais, 938 F.2d 347, 349 (1st Cir. 1991). But ______ _________ in most other respects, the criminal forfeiture is akin to a jail sentence or a fine and lacks the historical and moral roots that have led to a higher proof requirement for a finding of criminal guilt. Rogers' second objection is that the property forfeited does not fall within the statutory definition of property subject to forfeiture under section 853(a). The statute provides inter alia that property may be forfeited if _____ ____ "intended to be used . . . to commit, or to facilitate the commission of, such violation [the violation for which the defendant was convicted]." 21 U.S.C. 853(a)(2). Rogers contends that, the gravamen of the conspiracy being an agreement, there was no showing that any of the forfeited property was used or intended to be used to create the agreement. The argument is technical but not without some weight. It can certainly be said, as a matter of language, that the gist of an agreement is an understanding communicated by word or action, so that while Rogers' telephone [instrument] might be property used to commit the offense, the diamond, coins -17- -17- and motor home did not play an actual or prospective role in "such violation." This is a harder argument for Rogers as to the ranch since it was the place where the agreement was made and so arguably facilitated the agreement. E.g., United ____ ______ States v. Lewis, 987 F.2d 1349, 1356 (8th Cir. 1993). ______ _____ But as to the collateral, Rogers can colorably argue that the agreement was made--and therefore the crime was initially committed--without any direct "use" of the diamond, coins or motor home. Counter-arguments are available, assuming a broad usage of the word "use," showing once again that language is not a precise instrument. But we think it is permissible as a matter of language, and sound as a matter of legislative policy, to uphold the forfeiture on the ground that the forfeited property was "intended to be used" in carrying out the agreement.  True, the carrying out of the agreement would constitute a separate crime--possession by Rogers with intent to distribute--which is not the "such violation" referred to by the statute. But it is also true that the carrying out of the agreement would comprise a continuation of the conspiracy itself ("such violation"). United States v. Brandon, 17 F.3d _____________ _______ 409, 451 (1st Cir.), cert. denied, 115 S. Ct. 80 (1994) ____________ (conspiracy may be a continuing agreement). The agreement would be reaffirmed and maintained, and could be so proved at -18- -18- trial, by the very uses of the diamond and money (as collateral) and of the ranch (to hide the drugs). Sound policy points in the same direction. Although section 853 is a criminal penalty, it is apparent that Congress was endeavoring not only to increase punishment of drug offenses but also to discourage them by making them highly unprofitable. In that spirit, section 853(a)(2) defines the property to be forfeited quite broadly ("used, or intended to be used, in any manner or part, to commit, or to facilitate"), and the statute further provides that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes." 21 U.S.C. 853(o). Finally, Rogers argues, in connection with the forfeiture as well as conviction, that the property taken from the safe was not properly admitted under the inevitable discovery doctrine. Whether or not our harmless error analysis would work as well in relation to the forfeiture counts is a debatable issue, but we need not resolve it. For it is settled that even an illegal seizure of property does not protect it against forfeiture so long as the government can sustain the forfeiture claim with independent evidence. INS v. Lopez-Mendoza, 468 U.S. 1032, 1040 (1984). ___ _____________ This latter requirement is easily satisfied in this case. Cunniff gave direct testimony that Rogers had offered the diamond, gold and motor home as a part of the collateral -19- -19- for fronting the marijuana, and there was some additional supporting evidence to this effect. It is apparent from the verdict that the jury accepted Cunniff's testimony and, as we already noted, the actual presence of the diamond, gold and motor home most certainly contributed very little to this result. Affirmed. ________ -20- -20-