54 F.3d 764
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 UNITED STATES of America, Plaintiff, Appellee,
v.
Hector RODRIGUEZ-PENA, Defendant, Appellant.
United States of America, Plaintiff, Appellee,
v.
Angel Galindez-Rodriguez, Defendant, Appellant.
United States of America, Plaintiff, Appellee,
v.
Gonzalo Velazquez-Rotger, Defendant, Appellant.
United States of America, Plaintiff, Appellee,
v.
Victor Rivera a/k/a Quique, Defendant, Appellant.
 Nos. 93-2259, 93-2260, 93-2261, 93-2262.
 United States Court of Appeals,
First Circuit.
 May 11, 1995.
 
 Rafael F. Castro-Lang for appellants Angel Galindez-Rodriguez and Victor Rivera.
 Rafael Anglada-Lopez for appellant Gonzalo Velazquez-Rotger.
 Harry R. Segarra for appellant Hector Rodriguez-Pena.
 Antonio R. Bazan, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jose A. Quiles-Espinosa, Senior Litigation Counsel, were on brief for appellee.
 D.Puerto Rico
 AFFIRMED IN PART, VACATED IN PART; AND REMANDED.
 Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and CYR, Circuit Judge.
 ALDRICH, Senior Circuit Judge.
 
 
 1
 Appellants Rodriguez Pena (Pena), Velazquez Rotger (Velazquez), Galindez Rodriguez (Galindez) and Rivera, co-defendants in a single criminal trial on multiple narcotics-related charges, jointly or severally advance assignments of error on appeal of their convictions: (1) the court erroneously instructed the jury on the meaning of "beyond a reasonable doubt"; (2) motions for severance should have been granted; (3) a motion to suppress pretrial photospread identifications should have been granted; (4) the court abused its discretion in allowing the government to present evidence which it withheld in violation of Federal Rule of Evidence 16; (5) the evidence was insufficient to convict; (6) the prosecutor committed reversible errors in his opening and closing arguments; and (7) the court should have instructed the jury on the defenses of entrapment and duress. We sustain one, and reject the rest.
 
 I. Background
 
 2
 Relating the essential facts most favorably to the verdict, United States v. DeMasi, 40 F.3d 1306, 1310 (1st Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995), in late December, 1991, a confidential informant of the United States Customs Service, known as "Gordo," responded to a shortwave radio request by a Colombian national, identified as Cabeza, to contact certain individuals in Puerto Rico. This led to meetings and telephone conversations over the next several months with various individuals, including Velazquez and Pena, during which a narcotics smuggling venture with Cabeza and his suppliers in Colombia was hatched. Both Velazquez and Pena worked closely on the planning and preparation with various undercover agents who became involved to facilitate Customs' monitoring of the plot. The evidence contains numerous photographs and over one hundred recordings of their discussions up until the moment it finally unravelled and several of the players were arrested. Gordo agreed to arrange the transport of the drugs to Puerto Rico and proposed utilizing a Customs undercover vessel to meet and receive the cargo from a Colombian ship at sea. Initially the conspirators contemplated bringing in 2,000 pounds of marijuana; subsequent discussions with Velazquez and Pena increased the amount to 5,000 to 6,000 pounds, or more. A shipment of up to 300 kilograms of cocaine was discussed as well.
 
 
 3
 On March 27, 1992 Gordo was scheduled to pick up 10,000 pounds of marijuana, and two kilograms of cocaine specifically intended for Velazquez, from the Colombian ship at sea. However, the latter had sailed off course, broken down, and after Pena provided Gordo with some equipment for an attempt at repair, was eventually forced to jettison its load and return to Colombia.
 
 
 4
 The conspirators were monitored as they continued to arrange for a successful importation throughout the month of April. Velazquez mailed a navigational device to Cabeza to facilitate the meeting of the two vessels at sea, and provided a second code sheet to Gordo. On April 30, however, Velazquez was arrested by local authorities on drug related charges, and Gordo suddenly left Puerto Rico, apparently because he thought the deal was dead. Customs agent Juan Dania, posing as Gordo's boss, communicated to Pena that the deal was still on and, after some hesitation, Pena agreed to continue. Pena thereafter met with agent Polo Diaz, who replaced Gordo, to discuss importing around 6,500 pounds of marijuana and 5 kilograms of cocaine, and was photographed. In subsequent discussions he spoke of another shipment of several hundred kilograms of cocaine. At a later meeting Pena provided Diaz with another new code sheet from the Colombians, and, a week later, with a number of emergency lamps for the ship. He remained in close contact with Diaz as they finalized plans to meet the shipment of a second load.
 
 
 5
 On May 30, 1992, five undercover Customs agents picked up 153 bales of marijuana and two Colombian participants from a Colombian ship at sea and transported them aboard their undercover vessel to Puerto Rico, as arranged. Cabeza contacted Diaz to inquire about the shipment and to discuss another shipment of 300 kilograms of cocaine. On or about June 1st they arrived in Puerto Rico, and Diaz telephoned Pena to obtain keys to a truck onto which Diaz was supposed to load the narcotics for delivery to Pena. Pena had obtained a red dump truck from his friend Victor Rivera, who had rented it from an acquaintance named Martin Salgado. Around the beginning of June, Rivera instructed Salgado to leave the truck at the Plaza Carolina. When it proved unusable, Pena enlisted Rivera to help obtain a second one, which Rivera partially financed together with another friend. On June 2, Rivera and the friend together delivered a white enclosed truck to Plaza Carolina.[1]
 
 
 6
 Pena and Diaz arranged that June 4th would be the date of delivery. The agents retrieved the truck from the Plaza Carolina, loaded it up, and delivered it back to the Plaza Carolina, as arranged. On June 4th Diaz phoned Pena to inform him the truck was ready and he would be waiting in his car at a nearby Burger King parking lot for Pena to deliver the money he owed for the shipment in exchange for the keys to the marijuana- laden truck. At around noon Diaz received a call on his car phone from Pena, who informed him that his nephew was on his way over to exchange the money for the keys. As they were talking a young black man approached, exchanged $30,000 cash with Diaz for the truck keys, and ran off.
 
 
 7
 Shortly thereafter the truck, followed by Pena driving a gray Volvo, followed by a burgundy silhouette van with tinted windows, were tailed by several surveillance teams from various federal agencies. The three vehicles pulled aside briefly on 65th Infantry Avenue, and several surveillance vehicles had to pass ahead in order not to blow their cover. When the convoy resumed, it made a left turn down Monte Carlo Avenue, heading toward the Monte Hatillo housing complex. Several surveillance vehicles made u-turns on 65th Infantry Avenue in order to head back toward the Monte Hatillo.
 
 
 8
 When the first of these, occupied by three federal agents, turned right onto Monte Carlo Avenue in pursuit of the convoy, the burgundy van suddenly pulled diagonally in front of their vehicle and raked it with machine gun fire. The ambush severely wounded the three agents. A second undercover car pulled up and several agents emerged to return fire. Shooting was also coming from elsewhere, apparently from within or around the housing complex. A third surveillance vehicle, driven by agent Montalvo and carrying two other federal agents, pulled up and observed the van and truck fleeing the scene. Pena's Volvo was nowhere in sight. Montalvo pursued the van and truck, but was slowed by automatic weapons fire from several individuals on foot. They lost sight of the two vehicles and stopped to pull on bullet-proof vests. As they were doing so, three individuals approached firing automatic or semi-automatic weapons. After some exchange of fire, Montalvo managed to hit one of them and the others retreated carrying the wounded man. Montalvo and his fellow agents then returned to the site of the first shooting incident to assist the injured agents.
 
 
 9
 The truck was later found parked in the housing complex. The owner of the van reported it stolen some hours later. The friend with whom Rivera had purchased the white truck reported it stolen around 3:30 that afternoon. Pena was arrested later that day when he went to local police to report that he had been kidnapped and handcuffed at gunpoint, and his car had been stolen, a story he later recanted in favor of cooperating with the government. Velazquez was already in custody, and was indicted on information gleaned from surveillance of his activities before his arrest. Rivera was arrested some months later on information provided by Salgado. Galindez was arrested in December of 1992 on other charges and was indicted in February, 1993 on charges in connection with this case after being identified in a photospread by agents Montalvo and Diaz.
 
 II. Jury Instruction on Reasonable Doubt
 
 10
 Appellants allege the court gave erroneous definitions of reasonable doubt in its preliminary remarks to the jury at the outset of the case, and in its final charge. At the outset, after defining reasonable doubt briefly and correctly, the court added,
 
 
 11
 It doesn't mean beyond all possible doubt or to an absolute certainty. Simply more evidence.
 
 
 12
 (Emphasis supplied). In its final instructions, it said,
 
 
 13
 It all boils down to an impartial consideration of all the evidence, and the evidence must leave you firmly convinced that a particular defendant in a given context of a particular charge is guilty.
 
 
 14
 (Emphasis supplied). Defendants took no exceptions, but claim these particular statements to be plain error under Federal Rule of Criminal Procedure 52(b). We may find plain error only where there is a "clear" or "obvious" error that affects "substantial rights." United States v. Olano, ___ U.S. ___, ___, 113 S.Ct 1770, 1776-78, 123 L.Ed.2d 508 (1993); United States v. Romero, 32 F.3d 641, 651 (1st Cir. 1994). Granted that an erroneous charge on reasonable doubt is plain error, Sullivan v. Louisiana, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), there is a scope of language that is acceptable. On the charge as a whole, we hold the words here fell within that scope.
 
 
 15
 Defendants rely principally on United States v. Colon-Pagan, 1 F.3d 80 (1st Cir. 1993). In Colon the trial court had defined reasonable doubt to mean, among other things, "proof of such a convincing character that a person ... would be willing to rely and act upon it." Id. at 81. Rely on it under what circumstances? A small matter? We found this particular language clearly erroneous, since it may have created the "incorrect impression that [the jury] can convict a defendant in a criminal case upon the basis of evidence no stronger than might reasonably support a decision to go shopping or to a movie or to take a vacation." Id. at 81. However, we declined to hold the same language, with the addition that the proof should be of such convincing character that the jury should be willing to act on it "in the most important decisions that you have to make in your own lives and for yourselves," constituted plain error. United States v. Gordon, 634 F.2d 639, 644 (1st Cir. 1980). Although the charge in Gordon was by no means ideal, the "convincing" was sufficiently defined to signal to the jury the gravity of its task; in Colon it was meaningless.
 
 
 16
 We readily distinguish our case from Colon. First, the preliminary charge here was not affirmatively wrong, it was merely incomplete. The court made that clear, and indicated it would further explain reasonable doubt at the end of the case. The vague "simply more evidence" language the court used to distinguish beyond a reasonable doubt from the preponderance standard is not automatically fatal here, as the court completed and amplified its remarks on the subject in its final charge.
 
 
 17
 Our only question is whether, as a whole, the instructions left the jury with the correct understanding of its responsibility. Romero, 32 F.3d at 651-52 (while preliminary statements that proof beyond a reasonable doubt required "scale" to "tip more to the government's side," taken alone, may suggest diluted burden of proof, instructions as a whole did not create obvious likelihood jury would be misled).
 
 
 18
 In its final charge the court said,
 
 
 19
 Remember what I said at the beginning.... [T]he defendants ... are presumed innocent until proven guilty beyond a reasonable doubt. They had no burden to testify or to present any evidence or prove that they are innocent. The government has the burden of proving every element of the charge or each charge, I guess, against each defendant beyond a reasonable doubt. And, of course, if the government fails to do so, ... you must return a verdict of not guilty to the particular defendant or charge that the government failed to prove beyond a reasonable doubt.
 
 
 20
 And what is this business of "reasonable doubt"? I gave you, at the beginning, a limited instruction on reasonable doubt; and I compared the standard of the civil case with the standard of a criminal case.
 
 
 21
 Now let me tell you more about it.... [R]easonable doubt is a doubt based upon reason and common sense and may arise from a careful, impartial consideration of all the evidence in the case, or from lack of evidence. Proof beyond a reasonable doubt is proof that leaves you firmly convinced that a given defendant is guilty of a given charge.
 
 
 22
 If after a careful and impartial consideration with your fellow jurors of all the evidence, you are not convinced beyond a reasonable doubt that a particular defendant is guilty of a particular charge, it is your duty to find that particular defendant not guilty.
 
 
 23
 On the other hand, if after a careful and impartial consideration with your fellow jurors of all the evidence, you are convinced, beyond a reasonable doubt, that the defendant is guilty, it is your duty to find the particular defendant related to that particular charge guilty.
 
 
 24
 It all boils down to an impartial consideration of all the evidence, and the evidence must leave you firmly convinced that a particular defendant in a given context of a particular charge is guilty. (Emphasis supplied.)
 
 
 25
 The court expressed the government's burden of proof beyond a reasonable doubt, neat, seven times. Did summing it up by saying that "it all boils down to" the evidence must leave the jury "firmly convinced" of the guilt of each defendant dilute its well-hammered instruction? The court did not leave the impression, as it did in Colon, that members of the jury could convict on the basis of evidence no stronger than might convince them to go shopping. Colon-Pagan, 1 F.3d at 81. The jury had to be "firmly convinced" that each defendant "is guilty," a matter of ultimate importance. We attach weight also to the word "firmly." The common meaning of "firm" is "fixed." We do not consider this summation of the court's repeated articulation of the government's burden to have improperly diminished that burden. Cf. United States v. DeMasi, 40 F.3d 1306 (1st Cir. 1994); Romero, 32 F.3d 641; United States v. Glenn, 828 F.2d 855 (1st Cir. 1987).
 
 
 26
 We strongly observe, as we have before, that lengthy explanations of reasonable doubt offer little gain, and much risk. See, e.g., United States v. Olmstead, 832 F.2d 642, 645 (1st Cir. 1987), cert. denied, 486 U.S. 1009, 108 S.Ct. 1739, 100 L.Ed.2d 202 (1988). Solicitude for the jury is understandable, but there is no duty to explain that phrase, let alone to embellish. Victor v. Nebraska, 114 S.Ct. 1239 (1994).
 
 III. Severance
 
 27
 Velazquez, Galindez and Rivera contend the court committed reversible error in denying their motions for severance.[2] They claim as ground for reversal a highly prejudicial spillover effect stemming from the prosecutor's relentless emphasis on the shoot-out, for which none of them stood charged.[3]
 
 
 28
 Severance is warranted only when there is a manifest and serious risk that a "specific trial right" will be compromised, or that the jury will be unable to make "a reliable judgment about guilt or innocence." Zafiro v. United States, 113 S.Ct 933, 938 (1993). District courts have wide discretion to decide severance motions, that we are "reluctant to secondguess." United States v. Boylan, 898 F.2d 230, 246 (1st Cir.), cert. denied, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993). We will interfere only if it is "plainly abused." United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991), cert. denied, 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 149 (1992).
 
 
 29
 Appellants do not allege that any specific trial right was violated, but rather that the prosecutor's overdramatization of the "bloodbath" prejudicially affected the jury's ability to make a reliable judgment. They point to the acquittal of two original codefendants whose motions for severance were successful as evidence of prejudice. But prejudice in this context "means more than just a better chance of acquittal at a separate trial." United States v. Pierro, 32 F.3d 611, 615 (1st Cir. 1994) (quoting Boylan, 898 F.2d at 246); Zafiro, 113 S.Ct. at 938.
 
 
 30
 While in a trial of multiple defendants the risk of prejudice is magnified, for example, "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant," Zafiro, 113 S.Ct at 938, severance is not automatically required. Id.; Boylan, 898 F.2d at 246. Though none of the evidence relating to the shoot-out would have been admissible had appellants been tried separately, it was not offered to prove any charges they faced, and there is no indication the jury considered it against them. We presume juries capable of disregarding evidence where it is irrelevant to the charges against certain defendants. Pierro, 32 F.3d at 616.
 
 
 31
 Rule 14 leaves the granting of any relief to the sound discretion of the district court. Zafiro, 113 S.Ct at 938. Limiting instructions will often suffice. Id. In denying the motions, the district court promised to take care of any potential prejudice through appropriate instructions and, although appellants urge otherwise, we find it adequately did so.[4] We are particularly loathe to second guess the district court here, given that the jury manifested its ability to differentiate the defendants, and the evidence against each, by returning several acquittals.[5] Boylan, 898 F.2d at 246.
 
 IV. Pretrial Photo Identifications
 
 32
 Galindez assigns as error the admission of two pretrial photospread identifications, as well as the in-court identifications based on them. He argues that the circumstances surrounding the identifications were unduly suggestive, and unreliable.
 
 
 33
 Galindez was first named in February 1993 as the person who exchanged payment with agent Diaz for keys to the marijuana-laden truck on June 4, 1992. He was indicted after agents Montalvo and Diaz separately identified him in a photospread. Galindez moved to suppress the identifications and a hearing was held before a magistrate. The district court adopted the magistrate's recommendation for denial. Galindez now appeals.
 
 A. Standard of Review
 
 34
 We "uphold a district court's denial of a motion to suppress if any reasonable view of the evidence supports it." United States v. De Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993). See, also, United States v. McLaughlin, 957 F.2d 12, 16 (1st Cir. 1992) (collecting cases). The district court's findings relating to a motion to suppress are binding on appeal unless clearly erroneous. De Jesus-Rios, 990 F.2d at 677. See McLaughlin, 957 F.2d at 17 (collecting cases). A finding may be clearly erroneous, however, even where there is evidence to support it if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 35
 We employ a two-part inquiry: (1) whether the identification was "impermissibly suggestive," and, if so, (2) whether the totality of the circumstances indicates it was nonetheless reliable. De Jesus-Rios, 990 F.2d at 677 (collecting cases). Unreliability is found only where there is "a very substantial likelihood of irreparable misidentification." Id. (citations omitted). See, e.g., United States v. Maguire, 918 F.2d 254, 264 (1st Cir. 1990) ("it is only in extraordinary cases that identification evidence should be withheld from the jury"), cert. denied, 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1027 (1991). The magistrate purported to apply this test, and found neither suggestiveness nor unreliability. Based on the analysis below, we disagree.
 
 1. Suggestiveness
 
 36
 On February 8, 1993, agent Diaz inspected a photospread built around a photograph of Galindez which an uninvolved informant had identified as the person he heard had made the money for keys exchange. Diaz identified Galindez as the one with whom he had made the exchange. Agent Montalvo was shown the photospread the next day and also identified Galindez. Diaz testified that he was ordered not to talk to anyone about the photospread or his identification, and that he did not do so. Although Diaz continued to deny it at trial, Montalvo admitted both at the suppression hearing and at trial to speaking with Diaz about the photospread after Diaz had viewed it, but prior to examining it himself. The magistrate's ruling, although detailed, inexplicably fails to note and consider this strong hint of collusion between the identifying agents. We believe it raises the possibility of suggestiveness, requiring examination of the circumstances[6] in order to determine whether the ruling can nonetheless stand.
 
 
 37
 On June 4, 1992 Montalvo, along with two other agents, was surveilling the parking lot where Diaz was waiting for the exchange. He could not see Diaz's car, but could see as close as five feet surrounding it from about 6'-8' higher up and 35 feet away. It was around noon, and raining heavily, when Montalvo observed a young black male running toward Diaz's car. He disappeared from Montalvo's view in the vicinity of the car for about 30 to 60 seconds before re-emerging on the other side running toward the shopping mall. Montalvo concluded that this person had made the exchange, even though he could not observe it, because immediately afterward a radio report confirmed that the exchange had been completed, and because the suspect remained within the small radius surrounding Diaz's car for much longer than he would have had he simply continued running by.
 
 
 38
 On June 7 Montalvo prepared a report of his observations. He described this suspect as a young, black, Hispanic male, about 13-15 years old, wearing a multi-colored tee-shirt. The next day, during a preliminary hearing regarding co-defendant Pena, Montalvo repeated this description. He added that he saw the same youth a short time later riding as passenger in the marijuana-laden truck as the truck-Volvo-van convoy progressed toward the Monte Hatillo housing complex.
 
 
 39
 Before a grand jury convened to indict Galindez on February 10, 1993, the day after identifying Galindez in the photospread, Montalvo described him for the first time as having a long neck. At the suppression hearing held in April 1993, Montalvo testified that what caught his attention when observing the suspect running toward Diaz's car was his long neck. Montalvo then testified at trial that what caught his eye at the time was the suspect's long neck and "very protruding Adam's apple." When confronted with the fact that he had never mentioned the long neck and Adam's apple in the report he prepared just three days after the incident nor any time prior to seeing Galindez' photograph, Montalvo said that it was because the photo "refreshed" his memory. Both Montalvo and the agent who administered the identification procedure testified that all six photos in the spread were covered up to the chin-to assure that labels identifying the persons depicted could not be seen and that the photos appeared uniform-thus no necks would be observable. Montalvo said he removed the paper covering the neck of Galindez's photograph after he selected it but before initialling it.
 
 
 40
 Evidence tending to strengthen agent Diaz's identification of Galindez also materializes only after his viewing of the photospread. Shortly after the crime, Diaz was interviewed by an investigating case agent who prepared a report, dated July 20, 1992. This report contains no physical description of this suspect other than that he was black and wearing a black tee shirt with printed letters and jeans. Diaz, a Customs agent for seven years and trained in identification techniques, testified that he did not recall whether he had provided the investigating agent with more than this general description, but admitted that had he done so the agent would have reported it.[7]
 
 
 41
 Two days after he identified Galindez, Diaz testified before a grand jury that the feature he recalled specifically was a long neck. At the suppression hearing two months later Diaz testified that at the time of the incident he had specifically noted the suspect's long neck, recessed eyes, big lips and age between 18 and 22, and that when he identified Galindez he was certain because he would "never forget" the eyes, nose and mouth. It then emerged on cross examination that Diaz, who was not required to write a report himself, had taken contemporaneous "rough notes" of his participation in the undercover operation. These had not been provided to defense counsel and, despite his request, the magistrate refused to hold up the hearing to obtain them. Defense counsel proceeded without, and managed to establish that (1) Diaz had reviewed them before being interviewed by the case agent, and (2) they contained some description of the suspect but Diaz could not recall any details other than that he was black and wearing a black printed tee shirt, precisely the description contained in the agent's report.
 
 
 42
 The prosecutor produced Diaz's notes on the first day of trial, revealing a detailed description of the suspect as black, with brown eyes, short hair, long neck, heavy eyebrows and recessed eyes, 5' 6-8" and age 18-22. Diaz admitted on cross examination that he had thoroughly reviewed these notes before the suppression hearing, yet had been unable to recall anything about them when questioned by the defense at that time. It stretches credulity to believe that Diaz wrote contemporaneous notes describing the suspect as, among other things, having a long neck and recessed eyes, and that several weeks later when interviewed by the investigating agent, and after reviewing those notes, he provided none of that detail; that after again reviewing the notes for the express purpose of testifying about his identification at the suppression hearing, he was again unable to recall any of their detail; and that when they were finally revealed at trial those notes turned out to contain the very details tending to confirm the description Diaz gave for the first time at the suppression hearing, and describe the very features he claimed both at the hearing and at trial had most impressed him at the time of the incident.
 
 
 43
 Viewed in totality, the circumstances indicate a possibility that Montalvo was influenced by Diaz prior to his identification of Galindez, and thereafter both he and Diaz supplemented their descriptions to include features prominent in the photograph. Although law enforcement experience is a factor that mitigates susceptibility to suggestiveness, Maguire, 918 F.2d at 263, the pre-viewing conversation between the two agents, and the apparent post hoc doctoring of both their descriptions, destroys that presumption here. The finding below, which did not consider the improper conversation, is clearly erroneous.
 
 2. Reliability
 
 44
 A finding of suggestiveness, however, only requires exclusion when it creates a "very substantial likelihood of irreparable misidentification." De Jesus-Rios, 990 F.2d at 677 (citations omitted). This prong of the test questions "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 199 (1972). The following factors are probative:
 
 
 45
 (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.
 
 
 46
 De Jesus-Rios, 909 F.2d at 677 (citing Neil v. Biggers, 409 U.S. at 199-200 (other citations omitted)). Applying these factors, we note, first, that the record indicates Montalvo had but 25 seconds to view the suspect, in heavy rain, at a distance of, at best, 35 feet, and 6-8 feet elevated. He admitted his subsequent viewing of the same person in the passenger seat of the truck was somewhat obstructed-although he claims he recognized the tee shirt and general appearance-and fleeting, as it occurred while he was driving his own vehicle past the stopped truck. This may have been adequate to observe and note a long neck. Second, since Montalvo was assigned to surveillance, we may assume he was attentive. Third, his reported description just days after the events contains none of the detail that begins to appear in his descriptions subsequent to speaking with Diaz and then viewing the photospread. Fourth, although it only took Montalvo several minutes to pick out Galindez's photograph, he testified that he was confused because he remembered the hair of the person he saw as "coming straight down," whereas the photo depicted Galindez with very short hair.
 
 
 47
 Finally, eight months elapsed between the crime and the identification. This Court has allowed photospread identifications that have occurred as much as five years after the crime, but this has been where other factors strengthened considerably the reliability of the identification. See, e.g., United States v. Drougas, 748 F.2d 8, 28 (1st Cir. 1984) (five- year gap was "very much greater than would ordinarily be permissible," but unlike most cases, "the witness was not identifying an assailant ... he viewed only once under stressful circumstances;" he was co-conspirator who had spent considerable time with defendant). In Biggers itself, the Supreme Court noted that a seven month delay would "be a seriously negative factor in most cases," 409 U.S. at 201, but since the witness, a rape victim, had spent up to half an hour with her assailant, under artificial light, and at least twice "faced him directly and intimately," the identification was allowed. Id. at 200.
 
 
 48
 In light of the conversation between Diaz and Montalvo prior to Montalvo's viewing the photospread, the alterations in both of their subsequent descriptions, the suspicion that Diaz's "contemporaneous" notes were composed after the fact (and the ease with which the prosecutor could have cleared up that problem by promptly providing the notes to defense counsel), and the negative weight of the third, fourth and fifth Biggers factors compels the conclusion that at least Montalvo's identification was unreliable, and the district court was clearly erroneous in allowing it to go to the jury.
 
 
 49
 B. Was the Error Harmless Beyond a Reasonable Doubt?
 
 
 50
 Next, we assess whether the district court's error was harmless beyond a reasonable doubt. De Jesus-Rios, 990 F.2d at 678 (citation omitted). In overturning a district court's finding that a pretrial identification, though impermissibly suggestive, was nonetheless reliable, this court has focussed on the inevitable uncertainty concerning what role the impermissible identification played in the jury's decision to convict. De Jesus-Rios, 990 F.2d at 679.
 
 
 51
 In De Jesus-Rios, as here, there were two pretrial identifications, and no other evidence linking defendant to the crime.[8] The court found only one identification unreliable. In ruling nonetheless that the district court's error in admitting both was not harmless beyond a reasonable doubt, the court noted that it was possible that the jury had relied significantly upon the unreliable identification. The court was "concerned that the jury may have been persuaded to convict by the very fact that there were two witnesses who identified [the defendant]." Id. Here, too, it is possible that the jury rested its decision to convict on the fact that there were two identifications. We cannot conclude beyond a reasonable doubt that the district court's error was harmless.
 
 V. Delayed Discovery
 
 52
 Rivera challenges the admission into evidence certain telephone records revealing calls between his line and those belonging to others involved in the conspiracy that the government did not provide until the first day of trial. The government admitted to possessing some of them as much as one year before trial. Rivera reasserts his argument below that the government's late disclosure violated Rule 16 of the Federal Rules of Criminal Procedure[9] and prejudiced his defense by depriving him of the opportunity to investigate the calls.
 
 
 53
 We review a district court's ruling on the prejudicial effect of a failure to provide pre-trial discovery for abuse of discretion. United States v. Alvarez, 987 F.2d 77, 85 (1st Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 147, 126 L.Ed.2d 109 (1993); see Fed.R.Crim.P. 16(d)(2). Prejudice must be proven to obtain reversal on appeal. Alvarez, 987 F.2d at 85.
 
 
 54
 The court allowed the evidence, finding that the government did not act in bad faith and that no prejudice resulted. See, e.g., United States v. Nickens, 955 F.2d 112, 126 (1st Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992) (citations omitted). We agree. The prejudice Rivera alleged below related entirely to linking him to the conspiracy, for which he was acquitted, and he proffers no additional proof of prejudice on appeal. This verdict itself verifies the court's ruling.
 
 
 55
 Rivera also challenges the admission of this evidence on relevancy grounds. This contention was not made to the district court.
 
 VI. Sufficiency of the Evidence
 
 56
 All appellants challenge the sufficiency of the evidence by which they were convicted, having made timely motions for acquittal to the trial court. On appeal, we assess the evidence as a whole, taking "all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Vargas, 945 F.2d 426, 427 (1st Cir. 1991) (internal quotations omitted); United States v. Montas, 41 F.3d 775, 778 (1st Cir. 1994), petition for cert. filed, (April 4, 1995) (No. 94-8798). We resolve all credibility issues in favor of the verdict. United States v. De Jesus Rios, 990 F.2d at 680.
 
 A. Galindez
 
 57
 Although we are awarding Galindez a new trial because of an erroneously admitted identification, it is still necessary to consider whether his motion for acquittal should have been allowed. Our evidentiary ruling leaves a viable identification. A jury might reasonably conclude that this identification alone, made by the agent who dealt directly and closely, if briefly, with the suspect, establishes Galindez's guilt beyond a reasonable doubt.
 
 B. Pe na
 
 58
 Pena was convicted of conspiring to import, importing, and possessing with the intent to distribute controlled substances in violation of 21 U.S.C. Secs. 952(a) and 841(a)(1) (Counts One, Two and Three), using a telephone in violation of 21 U.S.C. Sec. 843(b) (Count Four), possessing a firearm during commission of a drug trafficking offense in violation of 18 U.S.C. Sec. 924(c)(1) (Count Six), and aiding and abetting an attempt to kill three federal agents in the line of duty in violation of 18 U.S.C. Secs. 1114 and 2 (Counts Seven through Nine). Although he states a flat challenge to the evidence on all counts, we discern questions only with respect to the evidence for importation, possession of firearms, and the attempt to kill the agents.
 
 1. Importation
 
 59
 Pena attempts to place sole responsibility for importing the drugs on the undercover agents involved in the scheme, alleging that it was they, not he, who actually brought the marijuana across the border. Pena misinterprets the scope of the crime of importation. Importation of a controlled substance is a "continuous crime" that is not complete until the drugs reach their intended destination. United States v. Leal, 831 F.2d 7, 9 (1st Cir. 1987) (citing cases). Thus the fact that Pena was not present and physically involved at the point of entry into the United States does not absolve him. While the outermost limits of importation have never been defined by this Court, we are satisfied that the crime was ongoing when Pena took custody of the marijuana, the evidence of which is ample.
 
 
 60
 2. Use of Firearms During Drug Trafficking Offense
 
 
 61
 Section 924(c)(1) requires the government to show that the defendant "used one or more firearms during a drug trafficking offense." United States v. Reyes-Mercado, 22 F.3d 363, 367 (1st Cir. 1994).[10] There being no question that firearms were thus used, Pena claims the record lacks evidence that he used or possessed a firearm, actually or constructively, or aided anyone in procuring them, asserting he did not even know of their presence in the silhouette van that escorted the drug-laden truck after he and his co-conspirators took possession of it.
 
 
 62
 The government contends Pena's conviction can be upheld on either of two theories: first, Pena aided and abetted the occupants of the van in their possession of the weapons; second, he can be held criminally accountable for the reasonably foreseeable substantive offenses committed by others in furtherance of their joint criminal venture. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[11]
 
 
 63
 One who aids and abets a crime is punishable as a principal. 18 U.S.C. Sec. 2; Nye & Nissen v. United States, 336 U.S. 613, 618-619, 69 S.Ct 766, 769-770, 93 L.Ed. 919 (1949) ("one who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly"); United States v. Mitchell, 23 F.3d 1, 3 (1st Cir. 1994) (acts of principal are those of aider and abetter "as a matter of law"). To prove liability as an accomplice the government must show the defendant associated himself with a criminal scheme in some way, acted so as to demonstrate his wish to bring it about, and sought by his actions to make it succeed. Nye & Nissen, 336 U.S. at 619; United States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994). Criminal intent may be inferred from surrounding facts and circumstances. United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982). It is settled that for an accomplice to be convicted under Sec. 924(c)(1) the government must prove that he knew "to a practical certainty" that a firearm would be used or carried during a qualified offense, United States v. DeMasi, 40 F.3d 1306, 1316 (1st Cir. 1994); United States v. Torres- Maldonado, 14 F.3d 95, 103 (1st Cir.) (citing cases), cert. denied, ___ U.S. ___, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994).
 
 
 64
 The evidence establishing Pena's involvement in the drug importation conspiracy, as well as its size, aim and scope supports the conclusion that Pena aided and abetted the use of firearms in connection with the transfer of the narcotics into his custody. Pena himself directed the exchange of $30,000 in cash for keys to a truck containing over 9,000 pounds of marijuana. He then rode in the van to the Monte Hatillo complex to pick up his car. A coordinated convoy consisting of the truck, a Volvo driven by Pena, followed by the van, was later observed heading back toward the Monte Hatillo. The three vehicles pulled to the side of the road together, and turned together into the housing complex moments later. Both Pena and the truck's passenger were observed talking on cellular telephones. There was evidence suggesting that the van was also equipped with a cellular phone antenna, although activities within could not be seen due to its darkened windows. Finally, the convoy broke up just before the occupants of the van began shooting, and the truck and Pena's car rapidly disappeared.
 
 
 65
 A rational jury could conclude that the van was connected to and provided security for the operation, and that Pena must at least have known that the transaction would be secured with arms, and could expect that they would be used in the event of trouble. Further, the evidence supports a conclusion that the barrage of automatic weapons fire was designed to provide cover for Pena and the truck to escape, and that Pena both knew of and benefitted from it. It is immaterial that Pena did not carry or himself use a firearm, if he was aware that firearms were available for use during or in relation to the transaction, DeMasi, 40 F.3d at 1316, or if the firearms facilitated the crime or lent him courage to see it through. Reyes-Mercado, 22 F.3d at 367.
 
 
 66
 Because the evidence is sufficient to support the conclusion that, at the very least, Pena knew to a practical certainty that the transaction would be secured with firearms, his conviction on count six is affirmed.
 
 
 67
 3. Aiding and Abetting the Attempt to Kill the Agents
 
 
 68
 The government contends the same theories of liability support Pena's convictions for the attempt to kill the agents; and Pena again seeks to avoid responsibility by claiming innocence of the identities, actions and intent of the occupants of the van. There is no question that an attempt was made to kill the agents during the drug operation; our only concern is whether Pena aided and abetted this attempt, or whether it was reasonably foreseeable to Pena that such an offense might be committed in furtherance of the conspiracy. Pinkerton, 328 U.S. at 648.
 
 
 69
 We hold that the jury could have inferred that Pena knew there were automatic weapons in the van for protecting the transfer of the narcotics, that Pena was in telephonic contact with the occupants of the van up until moments before the shooting began, and that the ambush of the agents was undertaken with his knowledge, if not pursuant to his orders, and that he benefitted by being able to flee the scene. A rational jury therefore could have found that the evidence indicated Pena was associated with the ambush, acted in a way that showed his desire that it succeed, and shared the requisite criminal intent to bear responsibility. The record also supports the conclusion that it was reasonably foreseeable to Pena that the firearms would be used in the event that the successful completion of the drug deal was threatened. United States v. Bruno, 873 F.2d 555, 560 (2nd Cir.), cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989). Pena's conviction on counts seven through nine are therefore affirmed.
 
 C. Rivera
 
 70
 Rivera was convicted for possession of a controlled substance with intent to distribute. He claims he is but a legitimate businessman whose tangential involvement in the scheme was innocent and unknowing, and that the evidence does not support the verdict.
 
 
 71
 Proof of criminal intent or guilty knowledge is essential under 18 U.S.C. Sec. 2,[12] Campa, 679 F.2d at 1010, otherwise anyone who brushed a criminal en route to his deed could be swept within the statute. See United States v. O'Campo, 973 F.2d 1015, 1020 (1st Cir. 1992). Rivera's knowledge and furtherance of the conspirators' plan can be inferred from his providing a truck to the conspirators, suggesting to its owner that he report it stolen, loaning his own money to help obtain a second truck, and the fact that this truck ended up reported stolen shortly after the incident. Although Rivera claims that all of this could be seen as the innocent pursuit of his trucking business, the jury acted within its province in resolving this credibility issue against him. Viewed in the light most favorable to the verdict, the evidence is sufficient to sustain Rivera's conviction.
 
 D. Velazquez
 
 72
 Velazquez challenges the sufficiency of evidence for all counts for which he was convicted: conspiracy to import marijuana and cocaine in violation of 21 U.S.C. Sec. 952(a) (count one); importation of 9,540 pounds of marijuana in violation of 21 U.S.C. Sec. 952(a) (count two); possession with intent to distribute marijuana in violation of 21 U.S.C. Sec. 841(a)(1) (count three); and use of a telephone in violation of 21 U.S.C. Sec. 843(b) (count five).
 
 1. Conspiracy
 
 73
 Velazquez attacks his conviction on counts one and five by claiming the evidence showed two distinct conspiracies, one failed effort before his arrest and incarceration on April 30, 1992, and another conceived only afterwards. He concedes the evidence supports his participation in the first,[13] but argues that the second, ultimately successful one, was formed and carried out only after his arrest by local authorities on April 30, 1992, and since he was still incarcerated on June 4, when this second scheme was consummated, it was impossible for him to have participated in it. He promotes his two conspiracy theory by claiming there were "new players" and new secret "codes" in the second plot, and that about four times as much marijuana was ultimately imported than he and the original conspirators contemplated.
 
 
 74
 Velazquez makes this argument for the first time, having conceded the sufficiency of evidence to convict on count one to the trial court. "It has long been the practice in this circuit that an issue not presented in the district court will not be addressed for the first time on appeal." United States v. Curzi, 867 F.2d 36, 44 (1st Cir. 1989). We discuss it only because he makes an essentially similar argument regarding counts two and three, which he did not concede, and it bears on the question concerning those counts.
 
 
 75
 Whether multiple conspiracies existed is a question of fact for the jury. United States v. Bello-Perez, 977 F.2d 664, 667 (1st Cir. 1992); United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984). To have proceeded on the assumption that a single conspiracy existed in this case, the jury need only have found that the evidence as a whole adequately showed that all the co-conspirators "knowingly and intentionally 'directed their efforts towards the accomplishment of a common goal or overall plan' to commit the substantive offense charged." Bello-Perez, 977 F.2d at 667-668 (quoting Drougas, 748 F.2d at 17). The jury need not have found that they joined the conspiracy together, participated at the same time, nor even that they all knew each other. Bello-Perez, 977 F.2d at 668 (citing cases).
 
 
 76
 Save for his own removal by arrest, the only change of players was the replacement of one of the government's agents after a first botched attempt in March 1992. The other players remained and continued with the original plot. Nor does the fact that much more marijuana was imported than the original negotiations contemplated necessarily cleave the conspiracy in two. The jury could have readily found that new codes were issued for security reasons. There is no reason it could not have found beyond a reasonable doubt that there was a single conspiracy in which Velazquez clearly played a part.
 
 2. Use of Telephone to Facilitate the Crime
 
 77
 Section 843(b) makes it a crime to use a communication facility, such as a telephone, to facilitate the commission of a crime such as importation of controlled substances. Velazquez was convicted of one count of violating Sec. 843(b) on the basis of unrefuted evidence of a telephone conversation on March 9, 1992, in which he discussed details of the importation plans with a confidential informant who recorded the call. He employs the same two conspiracy theory to attack this conviction. We find the evidence more than sufficient to uphold it.
 
 3. Importation
 
 78
 Velazquez attacks his convictions for counts two and three by claiming his imprisonment by local authorities as of April 30, 1992 made it impossible for him to have participated after that time, and that evidence of his participation in the conspiracy before then was insufficient to prove his guilt beyond a reasonable doubt for the substantive counts.
 
 
 79
 The trial court was initially inclined to grant Velazquez's motion for acquittal for these two counts, but reconsidered. The government contends that the evidence is sufficient to support his convictions "at least as an aider and abetter." Velazquez contends that all the unlawful actions comprising counts two and three were committed by others after his incarceration, and therefore the government failed to prove his involvement in any of the elements of either offense.
 
 
 80
 With respect to his importation conviction, Velazquez fails to understand the scope of the law of conspiracy. The jury was properly instructed that a member of a conspiracy is criminally responsible for any illegal acts of co-conspirators committed in furtherance of it. Pinkerton, 328 U.S. 640; United States v. Munoz, 36 F.3d 1229, 1234 (1st Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995). Thus courts have held that the same evidence that supports a defendant's conviction for conspiracy to commit a crime may support his conviction for the substantive count, even where he did not commit it himself. See, e.g., United States v. Salazar, 958 F.2d 1285, 1292 (5th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 185, 121 L.Ed.2d 129 (1992). As we found the evidence sufficient to uphold both the jury's finding of a single conspiracy to import illicit narcotics in which both Velazquez and Pena were at various times involved, and Pena's conviction on the substantive count of importation, Velazquez's conviction for the substantive count may also stand.[14]
 
 4. Possession
 
 81
 We cannot make the same simple assertion with respect to Velazquez's conviction for possession of narcotics with intent to distribute, given that he was not convicted for conspiracy to commit this offense. Velazquez again contends that because he was incarcerated at the time his co- conspirators possessed the drugs, it was impossible for him to have been in possession himself, even constructively, within the meaning of 21 U.S.C. Sec. 841(a)(1), nor could he have aided and abetted their possession within the meaning of 18 U.S.C. Sec. 2.
 
 
 82
 Evidence of Velazquez's association, participation, and active promotion of others' possession of the drugs is sufficient to sustain his conviction as an aider and abetter. Nye & Nissen, 336 U.S. at 619. Velazquez actively associated himself with a scheme that was specifically designed to result in his possession and distribution of a substantial amount of narcotics by participating in initial negotiations over price and amounts and subsequent meetings and telephone conversations to refine details of the plan, attempting to travel to St. Maarten to pick up one of the suppliers, supplying a marine chart, inspecting an undercover Customs vessel for its suitability for the smuggle, providing a new set of secret codes and a navigational device after an initial attempt at shipment failed when the Colombian vessel carrying the narcotics got lost en route to Puerto Rico, broke down, and had to jettison its cargo, and bringing others into the scheme. There was no evidence he was acting merely as a facilitator for others with no intent to participate in possession and distribution himself. On the contrary, there was evidence that 2 kilograms of cocaine contained in the first, failed shipment were included specifically per his request and intended exclusively for him.
 
 
 83
 From this evidence the jury could have concluded that possession and distribution of the drugs were the obvious intended consequences of the plot to import, and that Velazquez promoted and facilitated that goal.
 
 
 84
 The only case of which we are aware that addressed a conviction for possession by an inmate on the basis of possession by his at-large co-conspirators involved a defendant who, while incarcerated, made numerous phone calls from prison to his cohorts between the time of his arrest and their apprehension with a cache of cocaine and directions to his apartment. United States v. Disla, 805 F.2d 1340 (9th Cir. 1986). Although Disla's conviction for conspiracy to possess cocaine with intent to distribute was upheld, the court reversed his conviction for the substantive count, holding that evidence he was involved as a conspirator before his incarceration could not support either an aiding and abetting or a constructive possession theory of guilt, given that there was no evidence Disla did anything to "effect" or "assist" the actual crime.[15] Id. at 1350-52.
 
 
 85
 The Disla court was foreclosed from considering Disla liable under Pinkerton, because the jury had not been given the requisite instruction. Id. at 1350. Here, as previously noted, the jury was properly instructed, consistent with Pinkerton, that a defendant is liable for the reasonably foreseeable substantive offenses committed by co-conspirators in furtherance of their joint criminal venture. We may therefore also affirm if possession of the drugs by Pena and the other conspirators was an act committed in furtherance of their unlawful agreement to import, such that Velazquez can be held accountable as a party to the plot.
 
 
 86
 As discussed above in relation to Pena, importation is a continuous crime that does not cease until the contraband reaches its destination. United States v. Leal, 831 F.2d 7, 9 (1st Cir. 1987) (citing cases). Whatever its final destination in this case, we are satisfied that upon the conspirators' taking possession of the marijuana-laden truck the crime of importation was still on-going. See ante. Thus, in this particular case, possession with intent to distribute a large cache of marijuana was committed by Velazquez's co-conspirators in furtherance of the crime they conspired to commit, and although it is agreed that he was incapable of possessing the drugs himself while imprisoned, his conviction for the substantive count can nonetheless stand.
 
 VII. Prosecutor's Conduct
 
 87
 A. Opening Statement and Presentation of the Evidence
 
 
 88
 Appellants Rivera and Galindez contend that, by creating the impression of a "planned," "ambush type situation" designed to kill the federal agents, and painting a graphic picture of "raining bullets" that produced a "blood bath," the prosecutor aimed to raise the passions of the jury. The crux of their argument is that by stating "the only possible verdict is that of guilty, because of an attempt to kill the agents," the prosecutor improperly urged the jury to do justice to the severely wounded agents. They further point to the prosecutor's emphasis throughout the trial on the culmination of the drug scam in the attempt on the agents' lives, tending to suggest it was an element of the conspiracy for which they stood charged. Neither was charged with the attempt to kill the agents. They claim the prosecutor so inflamed and confused the jury as to seriously prejudice their right to a fair trial.
 
 
 89
 We begin by restating that it is improper to suggest to the jury that it "act in any capacity other than as the impartial arbiter of the facts." United States v. Manning, 23 F.3d 570, 573 (1st Cir. 1994). Appealing to the jury's emotions or suggesting in any way that it feel a duty to convict is error. Id. (telling jury, "take responsibility for yourselves," "take responsibility for your community" and "convict the defendant because justice compels conviction" is error); United States v. Young, 470 U.S. 1, 17, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (error to urge jury to "do its job"); United States v. Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1986) (error to urge jury to "do its duty"). While the line separating improper from acceptable behavior in our adversary system is "not easily drawn," Young, 470 U.S. at 7, we assume without deciding that to the extent the prosecutor's comments could be understood to urge the jury to avenge the injured agents, they were improper.
 
 
 90
 Whether those comments warrant a new trial, however, turns on whether they likely affected the outcome. Manning, 23 F.3d at 574 (citing cases).[16] We look to the severity of the misconduct, the context in which it occurred, the curative effect of the judge's admonitions, if any, and the strength of the evidence against the defendant. Id. (citing cases).
 
 
 91
 We do not find the factors in this case compel a new trial. An objection to the statement was sustained and the prosecutor did not repeat it. No remedial action was requested, nor was any offered-perhaps a decision not to draw attention to the remark. See Mandelbaum, 803 F.2d at 44 (although urging jury to "do its duty" was error, it was not reversible error). It was made during opening statements wherein it was unlikely to have had a lasting effect. Moreover, that Rivera was acquitted of the conspiracy charge demonstrates that the jury was not so confused or inflamed that it could not rationally evaluate the charges and the evidence.
 
 B. Misstatement of the Evidence in Closing
 
 92
 Galindez and Rivera allege the prosecutor materially misstated the evidence in his closing argument. Because we find Galindez deserves a new trial on another ground, we address only Rivera's claim here.
 
 
 93
 Rivera objects to the prosecutor's summation of the evidence in which he suggested that Rivera called the owner of one of the two trucks that he had obtained for Mr. Pena and advised him to report it stolen, and that these acts show knowledge. Rivera's attorney did not object. On appeal, Rivera points to the record which reveals that the owner repeatedly called Rivera about his truck, and only after repeated assurances that he would return it as soon as it turned up did Rivera suggest that if the owner wasn't satisfied he should report it stolen.
 
 
 94
 Absent objection, we review for plain error. United States v. Arrieta-Agressot, 3 F.3d 525, 528 (1st Cir. 1993). Except on rare occasions, a defendant "who believes that a prosecutor's closing argument goes too far must usually object to the offending statements when and as they are uttered." United States v. Sepulveda, 15 F.3d 1161, 1186 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). Absent objection it seems fair to give the arguer the benefit of every plausible interpretation of her words." Id. at 1187.
 
 
 95
 The evidence is unequivocal, regardless of who called whom, that Rivera told the owner he should report his truck stolen. Further, Rivera provided him with a false name and telephone number to use in the stolen vehicle report. The evidence also showed Rivera was involved in obtaining a second truck, the one that was ultimately used, and on the day of the incident he gave this owner the same advice, and shortly after the shooting this truck was reported stolen.
 
 
 96
 Although we do not condone prosecutorial distortions of evidence, United States v. Carrasquillo-Plaza, 873 F.2d 10, 14 (1st Cir. 1989), the misstatement here did not prejudice Rivera's right to a fair trial. See, id.; United States v. Pasarell, 727 F.2d 13, 16 (1st Cir.), cert. denied, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). Suggesting that a truck be reported stolen, whether after pestering or on his own initiative, could amount to an attempt to hide guilt, and the jury was entitled to so infer. The conclusion that Rivera was knowingly involved can readily be drawn even from the facts as he would present them.
 
 
 97
 VIII. Requested Jury Instructions on Entrapment and Coercion
 
 
 98
 Pena assigns as error the district court's refusal to instruct the jury on his defenses of entrapment and coercion or duress. A defendant is entitled to instruction on his theories of defense so long as "any probative material in the record" supports them. United States v. Rodriguez, 858 F.2d 809, 814 (1st Cir. 1988). This is a question of law for the court and review is plenary. Id. at 812, 814.
 
 A. Entrapment
 
 99
 The entrapment defense, like any other, "is measured by the time-honored sufficiency of-the-evidence yardstick." Id. at 814. Entrapment has two essential elements: (1) government inducement to engage in criminal activity, and (2) the defendant's lack of predisposition to engage in such conduct. Id. at 812, 814 (citing Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct 883, 886, 99 L.Ed.2d 54 (1988)). Defendant must produce sufficient evidence to support both elements. When viewed in the light most favorable to the accused, there must be some evidence which, "if believed by a rational juror, would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit," in order for defendant to be entitled to the instruction.[17] Rodriguez, 858 F.2d at 814.
 
 
 100
 Pena claims he repeatedly refused to go on with the scheme after Velazquez was arrested on April 10, 1992 and the original undercover agent was replaced by another, but that the latter urged him to continue. The evidence was ample that Pena willingly participated in the conspiracy at least until then. He therefore could not have sustained the lack of predisposition element and was not entitled to the instruction.
 
 B. Coercion or Duress
 
 101
 The district court also denied instruction on Pena's alternative defense that he acted under duress, coerced by government agents into continuing a criminal venture which he wished to abandon. For this defense, a defendant must adduce evidence sufficient, if believed, to convince a rational juror that (1) he acted under an immediate threat of serious bodily injury or death, (2) he had a well founded belief that the threat would be carried out, and (3) he had no reasonable opportunity to escape or avoid the threat. United States v. Amparo, 961 F.2d 288, 291 (1st Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992).
 
 
 102
 Pena presented his own uncorroborated testimony that he refused to continue negotiations to consummate the drug deal once Velazquez had been incarcerated and that the undercover agent threatened his parents with "the consequences" if he did not. A threat to injure some other person in the future is neither immediate nor unavoidable.
 
 
 103
 The conviction of Galindez is vacated and his case is remanded for a new trial; the remaining convictions are affirmed. @
 
 
 
 [1]
 The red dump truck was never returned to Salgado, who eventually reported it stolen after Rivera proved unable to provide any information on its whereabouts and advised him to make out a stolen vehicle report using a false name and phone number to describe the person to whom he had rented it
 
 
 [2]
 If it appears that a defendant ... is prejudiced by a joinder ... of defendants ... for trial together, the court may ... grant a severance of defendants, or provide whatever other relief justice requires
 Fed.R.Crim.P. 14.
 
 
 [3]
 Velazquez also contends that joinder was not proper to begin with because he had nothing to do with the shoot-out. As he was not charged with any offense arising from the shoot-out, and does not contend he was improperly joined for trial on the offenses for which he was charged, we find this argument without merit
 
 
 [4]
 The court's instructions were as follows:
 A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case for each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.
 In other words, the rule to be followed is a separate consideration of each person that is named as a defendant and of each charge that appears in the indictment.
 
 
 [5]
 Both Rivera and Galindez were acquitted of the main conspiracy charge
 
 
 [6]
 Galindez does not suggest, nor is there any evidence, that the procedure used was faulty. We therefore address only the circumstances surrounding the identifications
 
 
 [7]
 The agent, Juan Dania, a six year veteran, testified that it would have been his practice to report all descriptions provided by the agents he interviewed
 
 
 [8]
 The only other evidence linking Galindez to the crime are Diaz's notes containing a description to which Galindez can be matched. The notes cannot be credited
 
 
 [9]
 Rule 16 provides, in pertinent part:
 Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, ... which are within the possession, custody or control of the government and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial ...
 Fed.R.Crim. P. 16(a)(1)(C). Rule 16 imposes a continuing duty to disclose such requested material. Fed.R.Crim.P. 16(c). See, e.g., United States v. Tajeddini, 996 F.2d 1278, 1287 (1st Cir. 1993).
 
 
 [10]
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime ... be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short- barreled shotgun ... to imprisonment for ten years, and if the firearm is a machine-gun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years.... 18 U.S.C. Sec. 924(c)(1)
 
 
 [11]
 The court instructed the jury as follows:
 If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.
 This was sufficient. United States v. Alvarado, 898 F.2d 987, 993 (5th Cir. 1990); United States v. Gallo, 763 F.2d 1504, 1520 n.23 (6th Cir. 1985), cert. denied, 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 800 (1986).
 
 
 [12]
 It is immaterial that the indictment neither alleged aiding and abetting nor referred to 18 U.S.C Sec. 2. United States v. Sanchez, 917 F.2d 607, 611 (1st Cir. 1990), cert. denied, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991)
 
 
 [13]
 Such evidence included taped meetings with a confidential informant in which he participated in price negotiations, discussions of secret code sheets, and made an agreement to pay a certain sum for transportation of the drugs, as well as evidence that he personally inspected a U.S. Customs undercover vessel for its suitability for shipment and provided marine charts and code sheets to others to assist their planning and execution of the deal
 
 
 [14]
 Velazquez seems to make an argument that his arrest and incarceration effectively removed him from the conspiracy. Where membership in a conspiracy is proven, evidence of simply ceasing one's activities in connection with it, for whatever reason, is insufficient to constitute withdrawal. Munoz, 36 F.3d at 1234. An affirmative step, such as a full confession to authorities or communicating to co-conspirators abandonment of the enterprise and its goals, is required to avoid responsibility for the continuing crimes of co-conspirators. Id. Velazquez presented no such evidence, and the jury was entitled to surmise that but for his involuntary removal by arrest, he would have continued
 
 
 [15]
 The court held that an inference that he assisted the possession of his cohorts based on the telephone calls could not be drawn because there was no evidence as to the content of those calls
 
 
 [16]
 Although this line of authority derives from cases recognizing deterrence of prosecutorial misconduct as an additional basis for reversal, see United States v. Capone, 683 F.2d 582, 586 (1st Cir.1982), the Supreme Court eliminated this option where the error is harmless. United States v. Hasting, 461 U.S. 499, 506, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983)
 
 
 [17]
 Of course once defendant meets this entry-level burden, the government must prove beyond a reasonable doubt that no entrapment occurred. Rodriguez, 858 F.2d at 815 (collecting cases)